MINAHAN v. GRAND TRUNK WESTERN RY. CO.

(Circuit Court of Appeals, Sixth Circuit. June 15, 1905.)

No. 1,360.

1. FEDERAL COURTS—BILL OF EXCEPTIONS—SETTLEMENT—TIME.

A bill of exceptions in a case tried in a federal court may be settled at any time during the term, or thereafter until the end of the term during which judgment is rendered.

[Ed. Note.—For cases in point, see vol. 21, Cent. Dig. Exceptions, Bill of, §§ 49–51.]

2. SAME—EXTENSION OF TIME.

An order extending the time to settle a bill of exceptions, made during the pendency of the term at which the cause was tried, to a date later than the end of that term, of itself operated to prolong the control of the court over the cause, and justified the settlement of the bill at a later date.

3. TRIAL—PEREMPTORY INSTRUCTIONS—JOINT REQUESTS.

Where, in an action in which the facts were not conceded, plaintiff interrupted the court as it was passing on a motion to direct a verdict for the defendant, and asked leave to file certain requests to charge the jury, one of which was a request for a peremptory instruction for plaintiff, and the court permitted such requests to be filed, and assured counsel that he should have the benefit of them, such practice did not amount to a submission of the issues of fact to the court so that plaintiff was precluded from objecting to an adverse finding thereon.

4. CARRIERS—INJURIES TO PASSENGERS—PRESUMPTION OF NEGLIGENCE.

Injuries to a passenger by derailment of the car in which he was riding, while passing over a switch, created a presumption of negligence on the part of the carrier.

[Ed. Note.—For cases in point, see vol. 9, Cent. Dig. Carriers, § 1288.]

5. TRIAL—DIRECTION OF VERDICT—CONFLICTING EVIDENCE.

A trial judge in a federal court is not entitled, on his own view of the evidence, to direct a verdict, where there is a positive conflict in the evidence on a material issue.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, §§ 342, 343.]

6. SAME—QUESTION FOR JURY.

In an action for injuries to a passenger by derailment of the car in which he was riding, as it passed over a defective switch, conflicting evidence as to the cause of the defect *held* to present a question for the jury.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

Dickinson, Stevenson, Cullen, Warren & Butzel (Maybury, Lucking, Emmons & Helfman, of counsel), for plaintiff in error.

H. Geer, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The case brought up by this writ of error is an action instituted in the court below by the plaintiff in error to recover damages for personal injuries sustained by him in consequence, as he alleges, of the negligence of the defendant while he was a passenger on a car of defendant's passenger train, whereby the car was thrown from its track against an engine standing on

a side track at or near Millets Station, a few miles west of Lansing, Mich., on the night of April 5, 1902. The defendant pleaded the general issue, which, under the Michigan statute relating to pleadings in actions at law, is equivalent to a plea of not guilty. The issue was tried before a jury, and at the conclusion of the evidence adduced by the respective parties the court, at the request of the defendant, instructed the jury to return a verdict for the defendant. No question arises upon the pleadings. There are 53 rulings of the court assigned as errors. But as we are of opinion that the court erred in taking the case from the jury by its peremptory instruction, we shall pass all other questions, and, after attending to certain objections of the defendant in error, proceed to a statement of the reasons which lead to our conclusion upon the propriety of the general instruction given by the court. To do this, we must needs make a more particular statement of the case.

The plaintiff had taken a ticket at South Bend, Ind., for a passage over the defendant's road to Detroit. There were seven cars in front of the one on which the plaintiff was riding, and one, a sleeper, behind. The train left South Bend at 11:30 p. m., and at 3:30 in the morning was passing through Millets Station at a speed of 45 miles an hour. Some time before that a long freight train drawn by two engines, coming from the east, had passed off the main track, and was standing on a side track on the south side of the main track and parallel therewith, awaiting the passage of the passenger train, No. 6, on which the plaintiff was riding. There was a switch at the west end of the side track, and some distance west of the station house, leading into the main track, and the switch was adjusted so as to leave the main track clear for the passage through of the passenger train. This switch was of parallel rails, which at the movable end were thin, running to a point, and lying against the side of the rail when closed. The engine of the passenger train and seven cars passed over the switch safely. The forward truck of the plaintiff's car also kept the main track, but the switch apparently opened before the rear truck reached it, and the rear end of the car was carried off to the right, and the car thrown with great violence against the engine standing in the front end of the freight train. One of the passengers in the car was killed; several were seriously injured, among them the plaintiff, who was so grievously hurt that he is crippled for life. The cause of the accident was the dislocation of the switch bar at the joint where its two parts are united, whereby the part (which for convenience is called here part 2) carrying at their proper distance apart the front or movable ends of the switch rails was left unattached to the part (called part 1) coming from the switch stand, and the forward end of the switch was left floating, i. e., without any lateral fastening. Apparently, also, the concussion and jar of the passenger train had to do with the dislocation of the switch bars and the lateral movement of the fore end of the switch whereby it became opened. Until the afternoon of the day before the accident the switch stand had stood upon the south side of the tracks, but on that afternoon it was moved over to the north side of the tracks to make way for the

removal of the station house to the former site of the switch stand. And in transferring the switch stand to the north side it became necessary to detach part 2 of the switch bar from the switch rails and reverse its position, end for end, and again securing it to the rails of the switch. Part 2 was also detached from part 1 at the joint between them. Part 1 was carried over with the switch stand; the two long ties on the projection of which the stand rested were slid under the rails to the north, to form the projection for the stand there. The stand was relocated, parts 1 and 2 connected up, and the switch made to operate. This was finished at the close of the day's work. We have said that parts 1 and 2 were "connected up." But as the controversy is centered at this point, it is necessary to describe in detail the mode of this connection. This end of part 1 is flat and rounded at the extremity, near which a perpendicular hole is made in such wise that a loop is formed around the pin to be inserted in the hole, which loop is of a nearly even thickness around the sides and fore end of the bar. On the connecting end of part 2 a pin is secured perpendicularly, which enters the hole in the end of part 1. Then, in order to hold the end of part 1 down on the pin of part 2, a clip is riveted upon part 2 further back than the pin, is carried up the thickness of the end of part 1, and then carried parallel to part 2 part way over the rim or loop on the end of part 1. When the parts are formed in this manner, the only way of detaching them is by bending the free end of the clip upward and backward far enough to make space for lifting the loop off the pin. Some of the witnesses testified that this was the form of the parts of this switch bar. When these parts of the bar were first seen after the accident, the clip was thus turned up out of its normal place. Another form of making the parts of the bar is to carry out a projection, or tongue, on the end of part 1 beyond the pinhole. Then the clip on part 2 is made shorter at the free end so as to rest on the tongue only. In this form the parts may be readily disengaged by turning them at right angles to each other, thus carrying the tongue from under the clip. This is the form in which some other of the witnesses testify this switch bar was made. If this was so, there was no need of meddling with the clip, if the sectionman understood his business. But he says he was required to work expeditiously in order to get the switch in order for the passage of trains, and he had not much familiarity with switches. He had two men to help him, but they belonged to another branch of the service. He testified that after the accident he tried to bend the clip back to its place by hammering it with a fish plate, and, not succeeding completely with this, the superintendent of the tracks who had come to the place, hammered it back to place with an iron maul. The bar was then put in its proper place, and used two days after.

During the course of the trial the defendant produced before the court and jury the parts of a switch bar which some of its witnesses testified was the identical switch bar in question which had been taken out two days after the accident and preserved for testimony. Part 1 of this switch bar had a projection on the end where it con-

nected with part 2. Several witnesses for the plaintiff, who examined the bar on the morning after the accident to discover the cause of it, testified that it was not the same bar, and two professors of engineering and metallurgy from the University of Michigan testified that the clip bore no signs of having been hammered back to place, as it would have done if it had been the original bar. We cannot further prolong this statement of the evidence.

Two preliminary questions are raised by counsel for defendant which it is urged should first be settled before the merits are considered:

First. It is contended that from lapse of time after the trial the court had lost its authority to settle the bill of exceptions, and that it is therefore a mere nullity. The verdict was rendered June 30, 1903. The term then pending expired on the first Tuesday of November following. No judgment was rendered during that term. But on October 19, 1903, the court ordered that the time for settling a bill of exceptions should be extended until January 2, 1904. By successive orders the time was further extended until the time when the bill was settled, July 18, 1904, and thereupon the court entered judgment on the verdict for defendant. Meantime Mr. Meddaugh, the attorney of record for defendant, had, on December 20th, died, and the defendant had not appointed another. On April 20th counsel for plaintiff served a proposed bill of exceptions on Geer & Williams, who had managed and tried the cause as counsel for defendant. They made no objection to the service on account of Mr. Meddaugh's death, but took no action with reference to the settlement of the bill. On June 4th the plaintiff gave notice to the defendant to appoint a new attorney, as provided by a Michigan statute. This notice was ignored by defendant, and on the 8th of July the court made an order which, after reciting the notice and that no appearance had been entered for defendant, directed the defendant to show cause on the 11th of that month why the bill of exceptions which had been served on Geer & Williams should not be settled. On that day Geer & Williams and F. E. Rankin "appearing specially," as the record states, and, on an affidavit of Mr. Rankin stating the death of the attorney of record and that the extensions of time for settling a bill were made ex parte, moved that the order to show cause be dismissed. The motion was denied, and, on request of counsel for defendant, the time for settling the bill was extended one week, at the end of which time it was settled, as before stated. The contention for defendant is that the time wherein a bill of exceptions could be settled expired at the end of the term during which the cause was tried. But this is not a valid objection. By the lapse of the term without the rendition of a judgment, the cause remained open and in all things subject to the power of the court. Until the judgment was entered, the court had power to extend the time for settling a bill of exceptions, and, if the reasons for it were sufficient, it would be not only proper, but due to the party that it should be done. It is true that it has sometimes been said in judicial opinions that the bill must be settled during the term at which the cause was tried. But doubtless

this was so said because in the usual practice of the courts the judgment is entered before the lapse of the term, and the expression referred to was made in contemplation of the ordinary course, and so was an inexact statement of the rule as a universal one. In like manner a great number of decisions can be found wherein it is said that the power of the court over a judgment is at an end at the expiration of the term at which it was rendered. But this, while true as a general rule, has an exception, which is of frequent occurrence, when the cause remains open for some further action contemplated by the court. It is accordingly the established rule that a bill of exceptions may be settled at any time during the term at which the cause is tried, and thereafter, if judgment is deferred, until the end of the term during which it is rendered. And in Ward v. Cockran, 150 U. S. 597, 14 Sup. Ct. 230, 37 L. Ed. 1195, it was held that an order extending time for settling the bill made during the pendency of the term at which the cause was tried to a date later than the end of that term of itself had the effect to prolong the control of the court over the cause and justify the settlement of the bill at a later date. This view of the subject makes it unnecessary to consider what effect the death of the attorney of record in December, after the time had been extended beyond the trial term, would have upon the validity of notices given to defendant's counsel. For it is not contended that the notice given in June to appoint another attorney was invalid, or that the failure of the defendant to make such appointment was not sufficient to give ground for the action of the court in making the order on defendant to show cause, if the lapse of time had not deprived the court of power to make it.

The second question propounded by counsel is based upon the following facts: At the close of the production of evidence the counsel for the defendant preferred a request to the court that the jury be directed to return a verdict for that party. This request having been discussed by the counsel for the respective parties, the court was proceeding to give its opinion and instructions to the jury, and seemed to indicate, as plaintiff's counsel thought, a purpose to sustain the defendant's request for a positive direction in its favor. Thereupon the court permitted an interruption to allow the plaintiff's counsel to put on file certain requests to instruct the jury, and assured the counsel that he should have the benefit of them, and then, after giving its views at length, directed a verdict for defendant. The requests filed by plaintiff were eighteen in number, the first being as follows:

"(1) Under the pleadings and proofs, you are instructed that your verdict must be for the plaintiff, and the only question for you is as to the amount of damages."

The others related to particular matters of law and fact involved in the issue. The court did not comply with any of these requests. The plaintiff excepted to the ruling of the court upon defendant's motion for directing the verdict in its favor, and to the refusal of the court to give the instructions requested in his behalf. Coun-

sel for defendant now urge that the request of each of the parties for a peremptory instruction by the court had the effect of a joint withdrawal of the issues of fact from the jury and a submission of them to the court for its determination, and that, the court having decided them in favor of the defendant, both parties are concluded by the finding; citing Beuttell v. Magone, 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654. In that case there was no disputed question of fact, and it only remained for the court to state to the jury what the facts were, and what the law applicable to those facts was. And what the court there held in effect was that the court might state the facts as agreed, and not submit them to the jury. The language of Mr. Justice White, taken apart from the case before the court, might justify the conclusion which the counsel draws from it. But it would seem that the decision cannot be regarded as furnishing a rule for cases where the evidence is conflicting, and where the party whose request is refused has coupled with his request other requests directed to particular aspects of the case, which repel the implication that the party had consented to a submission of the facts to the court. And in all the cases in which the case of Beuttell v. Magone has been cited in the appellate courts the conditions were the same; there was no disputed question of fact, and there were no special requests. Merwin v. Magone, 70 Fed. 776, 17 C. C. A. 361; Magone v. Origet, 70 Fed. 778, 17 C. C. A. 363; Bradley Timber Co. v. White, 121 Fed. 779, 58 C. C. A. 55; United States v. Bishop, 125 Fed. 181, 60 C. C. A. 123; Phœnix Ins. Co. v. Kerr, 129 Fed. 723, 64 C. C. A. 251, 66 L. R. A. 569.

In Beuttell v. Magone it is expressly stated that such request made by the respective parties is not the equivalent of a submission of the case to the court without the intervention of a jury, within the intendment of Rev. St. §§ 649, 700 [U. S. Comp. St. 1901, pp. 525, 570]. The rule must therefore rest upon an implication of consent. Can any implication of consent be fairly drawn when, as here, the party couples his request for a peremptory instruction in his favor with further requests for instructions on the questions of law applicable to certain assumed facts which the jury may find? The presentation of requests for instructions in that form necessarily imports that the party expects that, if his first request is refused, the case will go to the jury, and that the court will give his other requests, or such of them as the court thinks are proper. For, if his request for a peremptory instruction is given, the others are futile. May not a party ask for a peremptory instruction in his favor without depriving himself, if the court thinks he is not entitled to it, of the right to have the jury pass upon the evidence and determine the issue? No valid reason is perceived why he should pay the penalty of losing a constitutional right by invoking the opinion of the court pro hac vice upon the preliminary question. It is, we believe, a common practice of the state and federal courts in Michigan and elsewhere in this circuit, when the party wishes to obtain the opinion of the court upon the question whether there is any evidence which could fairly be relied upon to defeat his claimed right, and, if the

opinion of the court should be that a question for the jury is presented, then to ask that appropriate instructions be given them to guide their deliberations, to present all his requests in a body, and the courts understand that to be the purpose, and conform to it. This was the course pursued here, and we do not think we should be justified in extending the rule stated in Beuttell v. Magone to a case thus differently circumstanced. In the case before us it is apparent that the judge did not suppose he was intrusted with the ultimate finding of the facts in the case. It appears that, before the plaintiff's requests were filed, the court had already indicated to the plaintiff's counsel that it was about to give a direction in favor of the defendant, and had already determined that the plaintiff was not entitled to recover. The court also stated that it would give to the plaintiff the benefit of his requests. But these could be of no benefit if the case was to be concluded by the judge's opinion on the facts. All this indicates that the court was co-operating with the plaintiff's counsel in his effort to save the questions presented by his requests.

Coming to the main question, the contention of the plaintiff was that, when the stand was moved in the afternoon, the sectionman, in order to detach parts 1 and 2 of the switch bar, pried up the end of the clip on part 2 so as to let the pin drop out of the hole in part 1; and that, when he had put the parts together again on the other side of the track, he neglected to bring the end of the clip back to its place. The defendant's contention was that the sectionman took the members of the bar apart and put them together again without disturbing the clip, and that the clip was afterwards raised by some unknown person out of malice against the railroad company, or that in some other unknown way the clip was raised without any fault of defendant. It is not claimed that the plaintiff was at fault, or disputed that, as matter of law, a presumption of negligence against the defendant was raised by proof of the accident, and the absence of fault on the part of the plaintiff. That such is the law is well settled. If the testimony of the defendant's sectionman and his helpers were not contradicted and were given full credit, it might, and probably should, be found that the defendant was exculpated. But their evidence was subject to some criticism, and not altogether consistent either in itself or with the uncontroverted facts; and, contradicted as it was by other unimpeached witnesses upon vital facts, the determination of such facts depended upon the credibility of the witnesses, and nothing is more clearly settled than that this is the province of the jury. The court below, in its opinion given before charging the jury, justifies the proposed instruction upon the ground that several unimpeached witnesses testified that when the switch was left that afternoon the clip was down in its proper position, and that this fact, thus proved, exonerated the defendant from any duty of further showing how the accident occurred. But the learned judge stated that it was conceded that the clip was sufficient for its purpose, and that there could be no accident attributable to the switch so long as the clip remained in its proper position. The undisputed facts remain

that the switch had, up to the time when it was changed, performed its duty and was then in proper condition, and that within a few hours thereafter it was found with the clip raised and the parts of the bar separated. The disaster coming so soon, naturally the attention of the inquirer is directed to the fact that the switch bar was opened the day before. If it was closed again, how did it get reopened? No one is charged with a malicious motive which would prompt to such a deed. Counsel for defendant exclaimed with much warmth against the imputation that the employés of the company had for the purposes of the suit substituted another switch bar for the genuine (a grossly scandalous proceeding, it is true, if the fact was so), and claimed that the presumption against such conduct was so strong that the evidence of the plaintiff's witnesses in that regard ought not to be credited. But the jury might well have thought that a still stronger presumption existed against the imputation that some other person or persons, with no apparent motive at all, might have done a deed which, if its purpose should be effected, would directly imperil the lives and safety of innocent persons. The circumstances of the case were such that the moral probabilities springing from established facts had a very potent influence in leading the mind to the truth. This species of evidence is often more convincing than the testimony of witnesses.

In his opinion the learned judge said:

"I state candidly that the undefaceable impression left upon my mind by this testimony is that the explanation offered by the railway company here in this case shows such a correct demonstration to my mind of immunity from liability that if the case were submitted to you for your decision upon the facts, and you should find contrary to the result which I will announce, I should deem it my duty, in the exercise of sound judicial discretion, to set that verdict aside. That being the duty forced upon me by the rules of law, I am not only authorized, but required to give to the facts proven judicially the same force and effect as if your verdict should be for the defendant."

If, indeed, the case for the plaintiff was so feeble that it would be the imperative duty of the court to set aside a verdict based upon it, we should have no doubt that the court might end the case by a peremptory instruction to find for the defendant. The court might, upon motion, in the exercise of "sound judicial discretion" upon its view that the clear preponderance of the evidence was with the defendant, set aside a verdict for the plaintiff and order a new trial. But the court cannot balance the evidence when it is conflicting, and then compel the jury to find a verdict according to the court's estimate of the relative weight of the evidence for the respective parties. Such a doctrine would efface the line of demarcation between the provinces of the court and jury.

Certain expressions used by the Justices in delivering the opinion of the Supreme Court are often laid hold of by counsel in cases in the federal courts as authority for some such doctrine as that of the court below. Indeed, in this court, and we have no doubt the same thing is true in the experience of all the federal appellate courts, come frequent repetitions of cases where opposite counsel contend for distinctly opposite doctrines in respect to the authority

of the trial judge to take the determination of questions of fact from the jury, and in support of their respective contentions an equally formidable list of decisions is cited; on the one hand, where language has been used almost, if not quite, as broad as that of the trial judge in the present instance; and, on the other hand, where that court has said that if there be any substantial testimony bearing upon an issue of fact to which the jury might, in the proper exercise of their rightful authority, give credit, the court is not justified in withdrawing the issue from the jury and deciding it upon its own estimate of the preponderance of the evidence. Undoubtly, it is distinctly settled that a mere scintilla, a spark, which arrests attention, and then from mere lack of vitality fades away, is not sufficient to warrant the submission of an issue of fact to a jury, when the scintilla is all that is developed by the party having the burden of proof. Such a showing has no substance, has not the quality of proof, and the judge may lawfully say so to the jury. And it must be admitted that the Supreme Court has gone a step farther than this, and assigned to the province of the court the right to direct the jury in those cases standing between those where there is a mere scintilla and those where there is substantial evidence, standing in a borderland, so to speak, where the evidence is so vague, indefinite, or inconsequential as not to furnish a reasonable foundation on which a verdict could rest. There are numerous cases in the Supreme Court where it is said that the judge may direct the verdict when the evidence is of such conclusive character that the court, "in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it." In the case supposed it would undoubtedly be the imperative duty of the court to set the verdict aside, and the refusal to do so would be a plain denial of justice. The judge is bound to see that each party is accorded legal justice, which could not be if one party were to obtain a judgment without proving his cause of action, or the defendant allowed to defeat a proven cause of action without establishing a defense. In other cases it is said the condition contemplated in which the judge may direct the verdict is when, "in his deliberate opinion, there is no excuse for a verdict save in favor of one party."

Greenleaf, in the first volume of his work on Evidence, § 49, with his customary precision thus states the fundamental rules of the trial of issues of fact:

"In trials of fact, without the aid of a jury, the question of the admissibility of evidence, strictly speaking, can seldom be raised; since, whatever be the ground of objection, the evidence objected to must of necessity be read or heard by the judge, in order to determine its character and value. In such cases, the only question, in effect, is upon the sufficiency and weight of the evidence. But in trials by jury, it is the province of the presiding judge to determine all questions on the admissibility of evidence to the jury, as well as to instruct them in the rules of law by which it is be weighed. Whether there be any evidence or not, is a question for the judge; whether it is sufficient evidence is a question for the jury."

In strict harmony with this statement is the language of Mr. Justice Clifford in Improvement Company v. Munson, 14 Wall. 442,

448, 20 L. Ed. 867, one of the leading cases generally cited on this subject, as follows:

"Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury; but recent decisions of high authority have established a more reasonable rule—that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

As is also the language of Mr. Justice Miller in Pleasants v. Fant, 22 Wall. 120, 22 L. Ed. 780, another case often cited, where, after citing Improvement Co. v. Munson and other cases, he states the rule with more precision by a distinct exclusion, thus:

"In the discharge of this duty it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor; not whether on all the evidence the preponderating weight is in his favor—that is the business of the jury—but, conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court, after a verdict, to set it aside and grant a new trial"—and makes the matter clear.

We think the whole subject may be shortly summed up by starting with the incontestable datum that the Supreme Court has never intended to propound and perpetuate two inconsistent rules for the guidance of the trial judge. It has by distinct and definite rulings declared that, if there is any substantial evidence bearing upon the issue to which the jury might in the proper exercise of its function give credit, the court cannot rightfully direct the jury to find in opposition to such evidence. Among the many cases to this effect are: Jones v. East Tenn. Ry., 128 U. S. 443, 9 Sup. Ct. 118, 32 L. Ed. 478; Washington, etc., Railroad v. McDade, 135 U. S. 554, 10 Sup. Ct. 1044, 34 L. Ed. 235; Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485; Richmond & Danville Railroad v. Powers, 149 U. S. 43, 13 Sup. Ct. 748, 37 L. Ed. 642; Gardner v. Michigan Central R. Co., 150 U. S. 361, 14 Sup. Ct. 140, 37 L. Ed. 1107.

If this proposition is established, it follows that the more general language used by the court in other cases should be construed consistently with the definitely stated rule. If it be urged that the argument might be conversely stated, and that the last-mentioned cases might be taken as stating the rule and the former be construed consistently with the latter, the answer is that the former are explicit and definite, and cannot be reconciled with the rule which the latter are supposed to authorize. We are not aware of any case where the Supreme Court has by actual decision declared that the trial judge may, upon his own view, direct the verdict, where there is a positive conflict in the evidence upon an issue material to the controversy. And by "evidence" we mean something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of "proof" or having fitness to induce conviction. Such a case was Riley v. Louisville & N. R. Co.

(C. C. A.) 133 Fed. 904, one of the cases on which the defendant relies. The testimony upon which the plaintiff relied in that case to prove the negligence of the railroad company in maintaining the switch in that form consisted of his own opinion and that of another employé that the ballasting under the switch should have been brought up to the ground level of the top of the ties. There was no conflict in the evidence as to what was the customary manner of building spring switches, which was to build them with a shallow excavation under them, and no question but that the particular switch was constructed in that form. If that was so, the testimony of those witnesses that in their opinion another form would be better did not bear upon the real issue, which was whether this switch was in the form in which such switches were customarily built. The evidence led to no consequence affecting the issue, and we held that the court below had properly directed the verdict for defendant. These facts which are stated in the opinion impose the proper construction upon the previous language of the opinion, in which it was said that, if the case was such as that, if a verdict were rendered for defendant, the court, in the exercise of sound judicial discretion, would have been bound to set it aside, the court did not err in directing the verdict. Another just such a case was Randall v. B. & O. R. Co., 109 U. S. 478, 3 Sup. Ct. 322, 27 L. Ed. 1003, cited as authority for the decision of Riley's Case. This subject has been discussed in former opinions of this court, especially in that delivered by Judge Lurton in Mt. Adams, etc., R. Co. v. Lowery, 74 Fed. 643, 20 C. C. A. 596; and the conclusions there reached were confirmed by the court in an opinion delivered by Mr. Justice Harlan in Travellers' Insurance Co. v. Randolph, 78 Fed. 754, 24 C. C. A. 305. Those conclusions were in substance those which we have here stated as in our judgment sound. But the frequency of the recurrence in this court of the question involved has induced us to again review the subject and restate our convictions in respect to the law governing it. If we misinterpret the rulings of the Supreme Court, we shall, of course, be glad to be set right upon the subject when opportunity shall occur.

The result is that the judgment must be reversed, with costs, and a new trial awarded.