MEMPHIS TELEPHONE CO. v. CUMBERLAND TELEPHONE & TELE-
GRAPH CO.

(Circuit Court of Appeals, Sixth Circuit.    March 17, 1916.)

No. 2681.

1. TELEGRAPHS AND TELEPHONES ☞16—TELEPHONE COMPANIES—EXCHANGE
OF BUSINESS WITH OTHER COMPANIES.
   In the absence of any statute or contract requiring connection to be
maintained between the lines of two telephone companies at a common
point, it is within the right of either company to sever such a connection.
   [Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig.
§ 10; Dec. Dig. ☞16.]

2. TELEGRAPHS AND TELEPHONES ☞69—EXEMPLARY DAMAGES—ACTS DONE
THROUGH MISTAKE.
   That a division superintendent of defendant telephone company, in
carrying out orders from its general manager to sever the connection be-
tween one of its lines and a line of plaintiff, by mistake made the sever-
ance beyond the point of connection, removing several hundred feet of
wire from plaintiff's line and retaining two of its instruments, in the be-
lief that they were the property of defendant, affords no ground for re-
covery from defendant of punitive damages.
   [Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig.
§ 71; Dec. Dig. ☞69.]

3. WORDS AND PHRASES—"TRUTH."
   There are three conceptions as to what constitutes "truth": Agreement
of thought and reality; eventual verification; and consistency of thought
with itself.

In Error to the District Court of the United States for the Western
District of Tennessee; John E. McCall, Judge.

Action at law by the Memphis Telephone Company against the Cum-
berland Telephone & Telegraph Company. From the judgment, plain-
tiff brings error. Affirmed.

J. W. Canada, of Memphis, Tenn., for plaintiff in error.
W. L. Granbery, of Nashville, Tenn., Hunt Chipley, of Atlanta, Ga.,
and Wright, Miles, Waring & Walker, of Memphis, Tenn., for defend-
ant in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and
COCHRAN, District Judge.

COCHRAN, District Judge.  This writ presents for decision a single
question, and that is whether the lower court erred in refusing to sub-
mit to the jury the issue in the case as to plaintiff's right to recover
punitive damages.  The action was in tort.  The plaintiff sought to
recover $25,000 therefor, of which $650 was on account of compensa-
tory damages, and the remainder punitive.  The defendant confessed
the tort and tendered $225 as the actual damages sustained.  The plain-
tiff admitted that this sum covered those damages, and the court in-
structed the jury to find for plaintiff in that amount.  It refused to
submit the question as to punitive damages, and this is the sole error
complained of.  We begin the consideration of this question with a

presentation of the nature of the tort and how it came to be committed.

The plaintiff, a Tennessee corporation, owned and operated a telephone system located in Memphis, Shelby county, with a long-distance line or connection extending down into Mississippi. The Tri-State Telephone & Telegraph Company, an Arkansas corporation, owned and operated such a system, located mainly in Arkansas, but extending into Missouri and Tennessee, whence its name, with headquarters at Osceola, Ark., to the north of Memphis. Its line in Tennessee extended to Munford, Tipton county, about 30 miles northeast or north of Memphis. September 9, 1910, the two companies entered into a contract to connect the two systems by a line from Memphis to Munford and to interchange business for a period of 25 years. Plaintiff was to build so much thereof as lay between Memphis and Millington, in Shelby county, about 16 miles from Memphis, and the Tri-State Company so much as lay between Millington and Munford. This line was so built. The point of junction was not in Millington, but at the north end thereof; plaintiff's portion of the line passing therefrom through Millington on to Memphis. The Tri-State Company's portion passed at about three miles from such point through Kerrville, and at about eight miles through Tipton, and thence on to Munford. Plaintiff built for the Tri-State Company so much of its portion as was between the point of junction and Tipton, and furnished a telephone instrument, not only at Millington, on its portion, but also at Kerrville and Tipton, on the Tri-State Company's portion. The work was completed July 31, 1911, and one paid message passed over it that day or the next morning. The next morning—i. e., the morning of August 1st—two laborers of defendant by direction of Foster Hume, a division superintendent of defendant, severed and took possession of about 1,000 feet of wire in plaintiff's portion of the connecting line in Millington, possibly as much as three-quarters of a mile on the Memphis side of the junction point, and took possession of the telephone instruments at Millington, Kerrville, and Tipton, which wire and telephone instruments seem never to have been returned to plaintiff. This is the tort complained of.

The defendant owned and operated a telephone system covering several states, including Tennessee, and the city of Memphis, with headquarters apparently at Nashville. Hume, its division superintendent, was located at Memphis, and had jurisdiction over western Tennessee and northern Mississippi. The direction of Hume which resulted in the commission of the tort came about in this way. The Southwestern Telephone & Telegraph Company, a Texas corporation, owned and operated a telephone system in Texas and Arkansas, and the Missouri Bell Telephone Company owned and operated such a system in Missouri. Shortly before the completion of the connecting line between plaintiff and the Tri-State Company's system, the Southwestern Company purchased the entire capital stock of the Tri-State Company and placed its officers and employés in charge thereof as directors and they proceeded at once to wreck the Tri-State Company. This they did by disposing of its system in separate parts and then dis-

solving the corporation and distributing its assets. The portion thereof in Tennessee was sold and conveyed to defendant, that in Missouri to the Missouri Bell Telephone Company, and that in Arkansas to the Southwestern Company. The sale and conveyance to defendant took place before the commission of the tort complained of. Upon the acquisition by defendant of this portion of the Tri-State Company's system, defendant's general manager at Nashville instructed Hume to take possession thereof and to sever all connections with other companies. It was in acting under this instruction that Hume gave the direction heretofore stated. He took it that the point of junction between the two portions of the connecting line was at the end nearest Memphis of the 1,000 feet which he severed, and that the three telephone instruments which he took possession of had been the property of the Tri-State Company. His reason for not merely making a severance at what he took to be the junction point, but removing the 1,000 feet of wire, was that it extended over the tracks of the Illinois Central Railroad Company, and he thought it might be dangerous not to remove it. In taking such to be the point of junction, he acted upon his own judgment. He had theretofore been told by some representative of plaintiff that it had built the line to Millington and that the Tri-State Company was to meet it there. The consideration which led him to so take was the character of the pole thereat. It was what is usually called a junction pole. His action was not within the instruction which defendant's general manager had given him, and he had no other authority to act at all; and there was no ratification of his action.

It would seem that the plaintiff did not know of the Southwestern Company's purchase and the change in ownership of the Tri-State Company's portion of the connecting line until after the severance had been made. It is possible that defendant had something to do with the Southwestern Company's wrecking the Tri-State Company other than merely purchasing the portion of its system in Tennessee. It and that company belonged to what is known as the "Bell Telephone System," and the name of the Missouri Company seems to indicate that it belonged thereto also. Thereby—i. e., by the wrecking of the Tri-State Company—the Missouri and Southwestern Companies got rid of competition therefrom, the former in Missouri and the latter in Arkansas, and the defendant got rid of competition from plaintiff for Memphis business destined for Arkansas and Missouri. On August 8th plaintiff caused defendant's two laborers to be indicted, but the indictment does not seem to have been prosecuted. It took the position that the action of the Tri-State Company in disposing of the portion of its system in Tennessee to defendant was a repudiation and breach of its contract with it, in that thereby it put it out of its power to comply therewith, and on November 10th it sued the Southwestern Company in Arkansas to recover $250,000 therefor. It based its right to recover on two theories, to wit—that that company had taken over and received the entire assets of the Tri-State Company, and that it had willfully induced and procured the Tri-State Company to commit a breach of its contract.

This suit resulted in the court where it had been brought in a decree for $34,500; i. e., $7,000 loss on the construction of its portion of

the connecting line and $27,500—i. e., $1,100 for each of the 25 years which the contract was to run—lost profits. This decree was entered April 29, 1913. On appeal therefrom the Supreme Court of Arkansas on February 16, 1914, reduced the amount of recovery to $10,300, it being held that plaintiff was entitled to recover for only 3 years on account of lost profits, which decree was subsequently paid. The amount paid was stated in the evidence below to have been about $16,-000; but, if it was so great, it must have been due to the costs. The plaintiff claimed therein that it was entitled to punitive damages, but this was denied it on the ground that the Southwestern Company had purchased and paid for a controlling interest in the Tri-State Company before it knew of its contract with plaintiff. Southwestern Telegraph & Telephone Co. v. Memphis Telephone Co., 111 Ark. 474, 163 S. W. 1153. Portions of the record in that case were introduced in evidence on the trial below by defendant to show that there had been a breach of the Tri-State Company's contract with plaintiff before any action on its part other than purchasing the portion of its system in Tennessee. The account of the case in the Arkansas Reports has been drawn on to a certain extent for some of the facts stated above in order to clearness of presentation of the question involved here and the considerations relevant thereto.

After plaintiff had obtained the decree for $34,500, and before its reduction by the Supreme Court of Arkansas, and more than two years after the commission of the tort complained of (i. e., on October 11, 1913), plaintiff turned its attention to defendant and brought the action against it which presents the question before us. In disposing of that question we are confronted by two subordinate ones. One is whether, in order for plaintiff to have been entitled to punitive damages, it was essential that the quality of Hume's conduct should have been such that punitive damages would have been recoverable of him had he been sued instead of defendant. It was such that he was suable; but, to say the least, it is questionable whether it was such that he was liable for such damages had he been sued. As, then, it may turn out that he was not liable therefor, it is important to determine whether matters other than the quality of Hume's conduct can be taken into consideration in disposing of the question as to defendant's liability therefor. Had Hume been sued instead of defendant, plaintiff would necessarily have been shut up to the quality of his conduct. No other consideration would have been relevant to the question of his liability for punitive damages. Was plaintiff limited thereto in its action against defendant? In other words, if, under the evidence, defendant had been guilty of wrongful conduct towards plaintiff otherwise than through Hume, can such conduct be taken into consideration in determining its liability for punitive damages on account of Hume's wrongful conduct, which it neither authorized nor ratified, and for which it cannot be made liable, except on the ground which makes every employer responsible for the wrongful conduct of his employé within the scope of his employment?

There are two ways in which it is possible that defendant was guilty of wrongful conduct towards plaintiff otherwise than through Hume.

In saying that it was guilty of wrongful conduct through Hume, nothing more is meant than that it was constructively so.  One of these ways is in being a party to the wrecking of the Tri-State Company and the breach of its contract with plaintiff, otherwise than as a mere purchaser of the portion of its system in Tennessee.  It is possible that the purchase of the capital stock of the Tri-State Company by the Southwestern Company and the subsequent sale and conveyance of the portions of its system in the three states as hereinbefore set out was the outcome of a conspiracy between the three companies advantaged thereby, so that it can be said that defendant was a party with the Southwestern Company in procuring a breach of the Tri-State Company's contract with plaintiff.  The other is in causing a severance to be made in the connection between the Tri-State Company and plaintiff's systems.  The question as to whether defendant was guilty of wrongful conduct towards plaintiff in this way exists apart from its having been a party to procuring the breach of that contract.

In the case of Townsend v. N. Y. C. & H. R. R. Co., 56 N. Y. 295, 15 Am. Rep. 419, the defendant corporation was held not liable for punitive damages for the wrongful conduct of one of its representatives within the scope of his employment because the quality of that wrongful conduct was not such that the representative would have been liable therefor had he been sued.  The plaintiff had purchased a ticket on defendant's line from S. to R. and took passage on a train which went only a part of the way.  The conductor on the train took up and retained the ticket without giving any check or other evidence of a right to passage on the next train.  Plaintiff took the next train on defendant's line for R., and when called on for his ticket informed the conductor that the conductor of the preceding train had retained it.  The conductor thereupon demanded the fare, and, it being refused, ejected the plaintiff.  It was held that the defendant was liable for compensatory damages, but not for punitive.  Judge Grover said:

"It must be kept in mind that the injury for which a recovery was sought was the forcible ejection of the plaintiff from the car by the conductor of the train, not the wrongful taking from the plaintiff of his ticket by the conductor of the other train.  The latter was regarded as material only as making the former act wrongful as against the plaintiff.  The court, in substance, charged that in putting the plaintiff off the car the conductor acted in what he believed was the performance of his duty to the company.  This being so, it is clear that no punitory damages could have been recovered against him, had he been sued instead of the company.  In Hamilton v. Third Avenue Railroad Company, 53 N. Y. 25, it was held by this court that a master was not liable for punitory damages for the act of his servant, done under circumstances which would give no such right to the plaintiff as against the servant, had the suit been against him instead of the master."

The necessities of this case, however, do not require that we determine the question which we have put.  This is because the evidence was not sufficient to call for a submission to the jury as to whether defendant had been guilty of wrongful conduct in either particular.  The most that can be said as to its bearing on defendant's connection with the breach by the Tri-State Company of its contract with plaintiff, other than as purchaser of the portion of its system in Tennessee, is that it created a suspicion that it was so connected.  Possibly it is

unjust to defendant to say that it goes this far, and reliance must be had on the report of the Arkansas case to even suggest such a thought. It is because plaintiff seems to be imbued with the idea that a great wrong was done it by the trespass on its property, which it could have been only on the basis that defendant was so connected with such breach, that we have felt impelled to deal with the possibility that it was.

[1] As to the severance of the connection between the two systems, had it been at the point of junction of the two portions of the connecting line or on the 'Tri-State Company's side thereof, no wrong would have been committed of which the plaintiff could complain, as is practically conceded. In the case of Home Telephone Co. v. People's Telephone & Telegraph Co., 125 Tenn. 270, 141 S. W. 845, 43 L. R. A. (N. S.) 550, the Supreme Court of Tennessee held that the making and maintenance of a connection between two telephone companies in the absence of a contract between them depends on statute. In Tennessee there is no statute covering the matter. Hence it was held therein that, if a connection is made under a contract which does not specify any time for it to run, the connection can thereafter be severed by one without the concurrence of the other. In this case the contract specified that the contract was to run 25 years. But defendant was no party to the contract. Its action in severing the connection was not, therefore, a breach of contract or other wrong on its part towards plaintiff. At the time it severed the connection the Tri-State Company had already breached the contract. The maintenance of the connection was of no value to plaintiff. The control which the Southwestern Company acquired of the Tri-State Company and repudiation of the latter's contract with plaintiff put an end to all interchange of business between the two companies. Possibly, as the contract was to run for a definite period of time, to wit, 25 years, plaintiff may have been entitled to its specific enforcement as against defendant as well as the Tri-State Company. But otherwise plaintiff had no other claim on defendant as to the maintenance of the connection and this claim was never asserted.

Of necessity, therefore, plaintiff's claim as to punitive damages against defendant is shut up to the question whether the quality of Hume's wrongful conduct was such that punitive damages were recoverable of him, had he been sued instead of defendant. There is no other possible basis on which his right to recover such damages of defendant can be placed. This presents us with the other subordinate question, heretofore referred to, and that is whether, if Hume's wrongful conduct was of such quality, that was sufficient to entitle plaintiff to punitive damages. Some courts hold that such damages may be recovered of a corporation for the wrongful conduct of any of its representatives within the scope of his employment, if it is of such quality as to render the representative liable therefor in a suit against him; whereas, others hold that such is not the case as to certain of the corporation's representatives. The ground of the position taken by the latter class is that one should not be punished vicariously; i. e., for the wrongdoing of another.

The Supreme Court of the United States, whose position is binding on this court, belongs to this class. In the early case of The Amiable Nancy, 3 Wheat. 546, 4 L. Ed. 456, it held that punitive damages could not be recovered against the owners of an American privateer for the illegal and wanton seizure and plunder of a neutral vessel and maltreating her officers and crew by a subordinate officer and certain of the crew of such privateer. It is to be noted that it did not appear that the commander of the privateer was a party to the wrongdoing, but seemingly it would have made no difference in the decision if he had been. In the later case of Lake Shore & Michigan So. Ry. Co. v. Prentice, 147 U. S. 101, 13 Sup. Ct. 261, 37 L. Ed. 97, it held that recovery of such damages could not be had against a railroad corporation for an illegal, wanton and oppressive arrest of a passenger by the conductor of one of its railway trains. The citation of this case in the opinion in that of Washington Gaslight Co. v. Lansden, 172 U. S. 534, 19 Sup. Ct. 296, 43 L. Ed. 543, may lead to the misapprehension that the doctrine thereof was applied therein, which was a suit against the Gaslight Company to recover damages because of the wrongdoing of its general manager. But it was held therein that the company was not liable at all and that because the general manager's action was not within the scope of his employment.

On the other hand, in the case of D. & R. G. Ry. Co. v. Harris, 122 U. S. 597, 7 Sup. Ct. 1286, 30 L. Ed. 1146, a railroad corporation was held liable in punitive damages for the acts of an armed force of several hundred men acting as its agents and employés and organized and commanded by its vice president and assistant general manager, which consisted in attacking with deadly weapons the agents and employés of another company in possession of a railroad and forcibly driving them out. In distinguishing the decision in this case from that in the Prentice Case Mr. Justice Gray said:

"The president and general manager, or, in his absence, the vice president in his place, actually wielding the whole executive power of the corporation, may well be treated as so far representing the corporation and identified with it that any wanton, malicious, or oppressive intent of his in doing wrongful acts in behalf of the corporation to the injury of others, may be treated as the intent of the corporation itself; but the conductor of a train, or other subordinate agent or servant of a railroad company occupies a very different position, and is no more identified with his principal, so as to affect the latter with his own unlawful and criminal intent, than any agent or servant standing in a corresponding relation to natural persons carrying on a manufactory, a mine, or a house of trade or commerce."

In the case of Post Pub. Co. v. Hallam, 59 Fed. 530, 8 C. C. A. 201, this court held that a newspaper corporation was liable to punitive damages for the malicious conduct of its general manager. Judge Taft said:

"He so far represented the defendant corporation as its general manager that his malice was in law the malice of the defendant."

And in the case of Pac. Packing & Navigation Co. v. Fielding, 136 Fed. 577, 69 C. C. A. 325, the Ninth Circuit Court of Appeals held that a corporation owner of a vessel could not be subjected to punitive damages because of the unlawful, oppressive, and malicious action of

the master in imprisoning a member of the crew, while at sea, which action was not authorized nor ratified by the corporation. The plaintiff pressed upon the court the view that the case came within the Harris Case and its approval in the Prentice Case. Judge Ross said:

"It is contended that this principle is applicable to the master of a ship at sea, who is for the time being in the sole and absolute command of the ship and of everybody in it; but we do not feel justified in so extending it, especially in view of the decision of the Supreme Court in the case of The Amiable Nancy, 3 Wheat. 546, 4 L. Ed. 456, the doctrine ˎof which case was expressly approved in Lake Shore, etc., Railway Company v. Prentice."

If there are any other pertinent decisions by the appellate federal courts, they have eluded search. An attempt should be made at generalizing these. Certainly the nonliability of the corporation is not limited to cases where the wrongful act was committed by a representative of it who is a mere underling. No liability may exist where he is a superior servant and that of considerable responsibility, as in the case of a conductor of a passenger train or the master of a vessel. On the other hand, liability exists where the act was committed by the president or board of directors. But it cannot be said that no liability exists as to all representatives short of the president and board of directors, for there is liability if the act was committed by the general manager, as in the case of a general manager of a newspaper corporation. Where, then, is the line to be drawn between those superior servants as to whom no liability exists and those as to whom there is liability? Possibly these decisions are not sufficient to fix the line exactly. But they do suggest that it is to be drawn between those who are over a part only of its affairs, as in the case of a conductor of a passenger train or the master of a vessel, and those who are over all its affairs, as in the case of a general manager of a newspaper corporation. And in the extract from Judge Gray's opinion in the Prentice Case, quoted above, it is to be noted that he places on the one side the president and general manager, or in his absence, the vice president in his place, actually wielding the whole of the executive power of the corporation, which suggests that the distinguishing characteristic of that side is that the representative wields the whole executive power of the corporation, and on the other side the conductor of a train or other subordinate agent or servant of a railroad corporation, which suggests that the distinguishing characteristic of this side is that the representative is a subordinate. But, at any rate, wherever the line is to be drawn, if it is to be held that defendant is liable for punitive damages because Hume was its division superintendent, this position must be reconciled with the position that a railroad corporation is not liable for such an act on the part of the conductor of one of its trains or ship corporation is not liable therefor on the part of the master of one of its vessels.

[3] There are three conceptions as to what truth is. Agreement of thought and reality, eventual verification and consistency of thought with itself. Thought should be consistent with itself if nothing else. And it would seem that these positions cannot be reconciled on the idea that Hume was over all defendant's affairs in a particular locality,

for this is true also of the conductor of a railroad train, in the one case, and possibly more so, of a vessel in the other. The necessities of this case, however, do not require that we determine whether, if Hume's conduct was of such quality as to render him liable for punitive damages, defendant was liable therefor also. We simply content ourselves, therefore, with developing the question. What relieves us of determining this question is that we feel constrained to hold that Hume's conduct was not in and of itself of such quality as to call for punishment.

[2] The rule as to what is essential to justify awarding punitive damages is well settled. To have it before us in estimating Hume's conduct we quote from 8 R. C. L. On page 586 it is said:

"Such damages may be recovered in cases and only in such cases where the wrongful act complained of is characterized by some such circumstances of aggravation as willfulness, wantonness, malice, oppression, brutality, insult, recklessness, gross negligence, or gross fraud on the part of the defendant."

On pages 588–590 a separate consideration is given to gross negligence as a basis for the recovery of such damages. And on page 591 the matter is put negatively thus:

"Exemplary damages are not authorized where a tort is committed unintentionally or through mistake or ignorance."

These expressions, save as to gross negligence, find justification in the decisions of the Supreme Court. In Milwaukee, etc., R. R. Co. v. Arms, 91 U. S. 495, 23 L. Ed. 374, it was held that gross negligence was not sufficient to warrant recovery of punitive damages. Mr. Justice Davis, in referring to what was essential, said:

"There must have been some willful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences."

How far, then, did the evidence tend to establish such misconduct or want of care on the part of Hume? To justify the submission of the question as to whether he had been guilty thereof, there must have been substantial evidence to that effect. Judge Severens in Minahan v. Grand Trunk Western Ry. Co., 138 Fed. 37, 70 C. C. A. 463, defined what is meant by substantial evidence by saying:

"Something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of proof or having fitness to induce conviction."

It is clear that Hume did not intentionally trespass on plaintiff's property. It was through a pure mistake that he did so. August 23, 1911. he saw plaintiff's general manager, Polk, and assured him that it was through a mistake that he cut the line at the wrong place. Polk did not question this, and there is every indication that he accepted the statement as true. He admitted that he did not think that Hume knew that plaintiff claimed the telephone instruments and stated that he brought to him the bill that plaintiff rendered the Tri-State Company for the work which it did for it, to try and prove that the latter owned them. Plaintiff introduced Hume as a witness on its behalf, as well as Polk, and these were the only witnesses who testified in

the case. Hume testified that he thought that he was dealing with what he believed to be defendant's property.

The only just criticism that can be made of his conduct is that he did not exercise due care to ascertain where the junction of the two portions of the connecting line was. It is claimed that he should have consulted plaintiff, which it was convenient for him to do, before acting. His explanation of why he did not do so was because he thought that he knew where the junction was. He was led to think that it was where he made the severance by the statement of plaintiff's representative, which was calculated to make him think that the point of junction was in Millington, rather than at its north end, and by the character of the pole. So far as he was guilty of a want of care, it does not measure up to the requirement. It was not such as to indicate "a conscious indifference to consequences." Some point is made of the fact that Hume refused to deliver up the telephone instruments to plaintiff, except on condition that plaintiff dismiss the prosecution against defendant's two laborers who actually did the work, and that Polk made affidavit that they belonged to plaintiff. It is not certain that Polk on that occasion did more than state that the instruments belonged to plaintiff or Hume more than state the terms on which he would deliver them up. Whilst it was Hume's duty to deliver them up without any condition, his position was not unnatural. He claimed that plaintiff's bill rendered to the Tri-State Company showed that they belonged to it, and he felt that if there was to be any criminal prosecution for what had been done that it should be directed against him, rather than the innocent laborers, who acted under his directions, and so stated to Polk. It is true, also, that Hume made no effort to restore the line. But there is no indication that a restoration thereof would have been of any value to plaintiff, the line having been erected as a connecting line between the two systems, or that plaintiff desired it restored. It is not unlikely that it did not.

Besides the plaintiff's declaration is liable to the construction that it sought punitive damages solely on the ground of willful misconduct. Three times therein it alleged that the tort was committed for the purpose of affecting plaintiff's business. The allegations are that it was committed "for the purpose of injuring the plaintiff in its business," "for the deliberate purpose of crippling, hindering and embarrassing this plaintiff in the carrying on of its business as a competitor of said defendant," and "for the deliberate purpose of stifling competition and crippling the business of this plaintiff." But there is an entire absence of evidence that Hume committed the tort for any such purpose and it had no real relation to the accomplishment thereof. Plaintiff's interchange of business with the Tri-State Company had theretofore been put an end to by its repudiation of its contract with plaintiff.

The judgment of the lower court is affirmed.