# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

## LOVE v. SCATCHERD.

(Circuit Court of Appeals, Sixth Circuit. May 1, 1906.)

No. 1,476.

1. TRIAL—DIRECTION OF VERDICT—REQUEST BY BOTH PARTIES—OPERATION.

Where each party requested the court to instruct the jury to return a verdict in his favor, it was tantamount to an affirmance by both that there was no substantial conflict in the evidence, and that the facts raised only a question of law.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, § 400.]

2. EVIDENCE—OPINION.

In an action for broker's commissions, a question asked defendant as a witness as to whether he understood that plaintiff came to defendant's residence representing the purchaser, and not as defendant's agent, was inadmissible as calling for defendant's opinion.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 2149–2185.]

3. BROKERS—CONTRACT—OPTIONS—CONSTRUCTION.

Plaintiff procured a contract authorizing him to sell defendant's timber land on a 5 per cent. commission; and, having found a purchaser, presented to defendant for his signature an option giving the grantee the right to purchase within 60 days. Defendant, before signing the option, but without any conversation with plaintiff, changed the same so as to read that the price was "net cash" to him. Held, that such alteration meant that the price was net cash to defendant as between himself and the purchaser and had no reference to defendant's contract with plaintiff for commissions.

4. SAME.

Defendant wrote plaintiff authorizing him to sell defendant's timber land in Arkansas agreeing that if plaintiff put defendant in communication with a reliable purchaser defendant would protect plaintiff on a commission of 5 per cent. Plaintiff immediately corresponded with a purchaser, who, at plaintiff's direction, wired defendant for a price; and this being agreed on, the purchaser wrote plaintiff a letter concerning the property inclosing a skeleton option which he desired defendant to execute. Plaintiff then went to defendant's place of business, showed him the purchaser's letter with the option, and defendant after some delay signed the option after inserting that the price should be net cash to him, but without any statement that it was to be free of commis-

146 F.—1

sions. *Held*, that defendant was not justified in believing that plaintiff was acting for the purchaser, and that it was therefore error for the court to direct a verdict for defendant in plaintiff's action for commissions.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

Action in assumpsit to recover the sum of $12,000, claimed to be due the plaintiff, A. M. Love, for his services in bringing about a sale of a tract of land belonging to the defendant, Scatcherd. The pleas were non assumpsit and nil debit. At the conclusion of all the evidence the court was requested by the defendant to instruct the jury to find against the plaintiff. The plaintiff thereupon requested the court to instruct a verdict for the plaintiff. There were no other requests and no exception to rulings upon evidence. The court instructed a verdict for the defendant and this is assigned as error.

The defendant below, who resided at Buffalo, N. Y., owned a body of land situated in Arkansas containing about 22,000 acres. The plaintiff below lived at Jonesboro, Ark., and in vicinity of Scatcherd's land. The contract, if any there was, by which plaintiff was to be compensated for bringing about a sale of Scatcherd's land, is to be deduced from certain correspondence between the parties. Such of it as is found in the transcript here follows: Prior to July 29, 1903, the plaintiff had written to the defendant, and on the 29th of July the defendant wrote to the plaintiff as follows:

"Buffalo, N. Y., July 29, 1903.

"Mr. A. M. Love, Jonesboro, Ark.—Dear Sir: We are in receipt of yours of the 20th and contents noted. We are not prepared at this time to make terms with you as we have concluded to take our property out of the market for the present. If you will write us again about the middle of next month, we will have come to a decision in the matter and will be pleased to entertain your proposition.

"Yours truly,        Scatcherd & Son."

The letter to which the above is a reply is not in evidence.

"Jonesboro, Ark., August 15, 1903.

"Gentlemen: Referring to yours of July 29th, in which you said you would at this time be in position to quote prices and terms on 22,000 acres of forest land you have near here, I will say that I have a man that wants to buy if price and terms are right. Mention me price you want for the tract and pay me 5 per cent. commission, also please mention your net price and protect me in the price from 50 cents to $1.50 for the trouble and expense of selling. The man that wants to buy was on the land 10 days ago, and will be back in 10 days. I will want you to allow sufficient time for parties to investigate and estimate timber, which is a big job.

"A. M. Love."

In reply to this letter Scatcherd & Son, on the 18th of August, 1903, wrote to the plaintiff as follows:

"A. M. Love, Jonesboro, Ark.—Dear Sir: We are thinking of taking our property out of the market, but if you have anybody who is reliable and with whom you can put us in communication regarding this property, we would protect you on a commission of 5 per cent. We would want to have an opportunity to look up the party as to his responsibility before making prices, and if this were satisfactory, before doing so, we would arrange all matters in detail with you. In any event, we would agree to protect you in case you furnish us names, etc.

"Yours truly,        Scatcherd & Son."

On August 29th the plaintiff wrote to the defendant as follows:

"Jonesboro, Ark., August 29, 1903.

"Scatcherd & Son, Buffalo, N. Y.—Gentlemen: I have some parties to look over your land next week from St. Louis, and they will want to know the

first thing what the price is going to be. Please tell me something in the neighborhood of what to say. It puts me in an awkward shape not to be able to make them some kind of price.

"Yours truly, A. M. Love."

This letter the defendant testified that he did not remember to have received. The only reason he gives is that he gets so many letters he can not remember them all.

On September 10, 1903, plaintiff wrote to one E. L. Westbrook the following letter:

"Jonesboro, Ark., September 10, 1903.

"Mr. E. L. Westbrook, City—Dear Sir: I am trying to sell for Scatcherd & Son of Buffalo, N. Y., their land at Mosher, Ark. There is about 22,500 acres of land located near the Frisco R. R., with about seven miles of standard guage railroad on it; good band saw, mill building, etc. The land is good for farming when the timber is taken off. I would like to sell you this land, as I think you can make some money out of it. You are also interested in some railroad propositions, as I understand. Why not take this up and you would have seven miles built, which would be a starter. I enclose you plat of the land and estimate of the different kinds of timber. Please let me know at an early date what you think of it.

"Yours truly, A. M. Love."

This letter was accompanied by a plat of the land, and an estimate of the timber and improvements.

On September 15th Westbrook wrote to the plaintiff as follows:

"Mr. A. M. Love, City—Dear Sir: I have been thinking of your suggestion to me about the purchase of the property of Scatcherd & Son, at Mosher, in Poinsett county, this state, and I am very favorably inclined to take hold of it. I represent some people who have money enough to carry out anything they become interested in, and if I took hold of the proposition it would be on a cash basis, and I believe I am now ready to make a cash offer of $9 per acre for this property, provided, of course, the timber is there that is thought to be there. When you are in again, please call up my office and we will place in writing what we agree on. I expect to be here all this week, but in the event I am out when you call, leave a note for me, making an engagement for any day most convenient for you.

"Very truly yours, E. L. Westbrook."

To which the plaintiff replied on the 18th of September as follows:

"Jonesboro, Ark., September 18, 1903.

"Mr. E. L. Westbrook, City—Dear Sir: I have just received yours of the 15th and called at your office but found you were not in. I am out of town a good deal, as you know, and I will ask you to take the matter up with Scatcherd & Son, of Buffalo, direct, and they will give you all the information you want about the property, also prices, terms, etc. Please let me know how you are getting along with it.

"Yours truly, A. M. Love."

On September 26th Westbrook telegraphed to the defendant as follows:

"Jonesboro, Ark., Sept. 26, 1903.

"John N. Scatcherd & Son, Buffalo, N. Y.—Will you accept $9 per acre cash for Poinsett county land?

"Edward L. Westbrook."

To which the defendant replied by telegram:

"Will accept $10 net cash if closed immediately."

On September 28th Westbrook telegraphed to the defendant as follows:

"Name day next week; can see you about land matter."

To which the defendant replied:

"Meet October six; will you be here? Others wire will be here beginning of next week."

On. October 2d Westbrook telegraphed to the defendant as follows:

"Jonesboro, Ark., Oct. 2.

"Scatcherd & Son, Buffalo, N. Y.—Will you send abstract to Citizens' Bank immediately for examination?

"Edward L. Westbrook."

To which the defendant replied October 3d as follows:

"Require abstract here; parties coming next week. Will you be here Tuesday?"

Tuesday following October 3d was October 6th.

"Buffalo, N. Y., Oct. 5, 1903.

"Mr. A. M. Love, Jonesboro, Ark.—Dear Sir: Contents of your letter of October 2d noted. If Luehrman ·Hardwood Lumber Co. desire to purchase our property we should be pleased to hear from them, but we have not ourselves offered this property to anybody. If they apply for prices, etc., we will be pleased to give the information to them.

"Yours truly,                          Scatcherd & Son."

The letter referred to of October 2d, is not in the transcript.

On October 7th Westbrook wrote to the plaintiff as follows:

"Mr. A. M. Love, Thayer, Mo.—Dear Sir: I have been so engaged with the affairs of the company that I have not had the opportunity to write you, and I have thought I would see and talk with you with reference to your request that I take up with Scatcherd & Son the purchase of the Mosher property in Poinsett county, direct, because of your probable absence from home. I wired Mr. Scatcherd to know if they would accept $9 per acre for the property and they wired in answer to my telegram that they would take $10 per acre cash. I immediately sought to make a date to meet these gentlemen in Buffalo and they wired me to meet them in Buffalo the following Tuesday and stated they expected other parties the first of the week to close the deal. Of course I did not care to make a wild goose chase of my trip and get there perhaps to find the property sold, so I decided to remain at home. I do not know if they have sold the property to the parties they expected, but I have concluded that I will take the property if they care to sell it for a cash consideration of $10 per acre, the actual acreage to be ascertained from the United States government surveys on file in the office of the clerk and recorder of Poinsett county, at Harrisburg, provided the title is good and the property is as represented. As I understand, the sale of the property at $10 an acre includes the land minus the cottonwood, the mill, buildings and land at Mosher, the railroad, locomotive and cars, saw mill, etc. This is a pretty good sized deal. and I would want to make a careful examination of the property as a whole. This is a bona fide matter with me, and I am ready to take it up on receipt of the proper assurances that I will be protected. Some people look at this property longingly, but the price is really pretty large and there are but few of us that can go into such a deal of the magnitude of this. I have therefore concluded to take the property, provided you can get the owners to execute the within contract, and if you care to take it up further with them, I will be very glad to have you do so. If the property is as represented and satisfactory and the title is good, I will take it and pay cash for it. You, of course, know me, but you might refer your people to the banks here or any one they may think of, R. G. Minnick, the former owner of the property included, if they would know further of me and my ability to take care of my contracts. If anything is done at all it will have to be done soon, as the fall rains will soon be here. I wish, however, that this property were out of the levee district, as the last legislature raised the levee taxes from four to six cents per acre. Please advise as soon as you can what you expect.

"Very truly,                          Edward L. Westbrook."

With this letter he inclosed the skeleton of a contract which he desired to make with the defendant.

To which the plaintiff replied on October 8th as follows:

"Thayer, Mo., October 8, 1903.

"Edward L. Westbrook—Dear Sir: I am in receipt of yours of 7th relative to your communication with Scatcherd & Son with regard to the purchase of their Mosher property, and will say I will take this matter up with Mr. Scatcherd next week in person, and see if I can procure the option you want. Will say that 60 days is quite a while. Could you not get along with shorter time? This property does not need a close examination, as you will realize when you come to examine, to see $10 per acre in it. Will let you know as soon as I see them what you may expect.

"Yours truly, A. M. Love."

Plaintiff, Love, thereupon wired Scatcherd that he would be in Buffalo within a day or two. He accordingly went and saw Mr. Scatcherd in his office. He carried Westbrook's letters of October 7th, set out above, and a copy of the proposed option contract accompanying the letter. Love testified that he gave this letter and option to Scatcherd, and told him he had come on to arrange for the option desired by Westbrook, as he thought he would take the land. Scatcherd, he says, read the letter, and took the option and interlined "net" before cash and then had the agreement rewritten. He further testified that Scatcherd said he was negotiating with another party and asked him to wait over until he could see what should come of that. This Love did. On the second or third day after arrival, Scatcherd agreed to give an option to Westbrook for thirty days, saying 60 days, the time asked for by Westbrook, was too long. That he then asked if he, Love, should take the matter up with Westbrook, as Westbrook was the man he was dealing with. That Scatcherd said: "You take it up with him by wire." Thereupon Love wired as follows:

"Buffalo, N. Y., Oct. 10.

"E. L. Westbrook, Jonesboro, Arkansas: Will only give 30 days' option. What will you pay for same. Wire me today, Hotel Brozelle, sure.

"A. M. Love."

Westbrook replied as follows:

"One hundred dollars for 60 days' option. Feel sure will take land, can do no better.

"E. L. Westbrook."

The option was given and before it expired Westbrook took the land and paid cash, $226,183 for same to Scatcherd direct.

Under date of November 5, Scatcherd wrote Westbrook as follows:

"Yours of the 28th received. Note that you say the option which was dated the 19th was so delayed in transit that 10 days of your time are gone by. There must be some error in this, because we received your signed receipt dated October 22d for the delivery of the option, which went by registered letter. This would show that it was only three days in transit. October 22d was the day that your receipt card was mailed. Note that you have men at work estimating the property. We received a telegram from Mr. Love in which he says the option was delayed, and asking us to send on the abstract of title to the bank. Is this your desire? In matters of this kind we would like it if you would communicate with us direct.

"Yours truly, John N. Scatcherd."

On December 14, 1903, Love wrote Scatcherd as follows:

"Jonesboro, Ark., Dec. 14, 1903.

"Scatcherd & Son, Buffalo, N. Y.—Gentlemen: As the deal between you and Mr. Westbrook on your Poinsett county land is now closed at $10 per acre, the amount of acres being as you and I figured, 22,619, please send me your check for 5 per cent. of the amount as per your agreement by letter August 18th to me. This was a good, big deal and you have done well, which I am glad to know, as it always encourages men of money to

invest in our country, and there are other investments here just as good. Wishing you success, Merry Christmas, a Happy New Year.

"Yours very truly,          ·  ·                                    A. M. Love."

To this Scatcherd replied, under date of Dec. 19th:

"Buffalo, N. Y., Dec. 19, 1903.

"Mr. A. M. Love, Jonesboro, Ark.—Dear Sir: Yours of the 14th received. Thank you for your good wishes at this time and I beg leave to state that I do not see wherein I owe you 5 per cent. in my trade with Mr. Westbrook. I wrote you in August that if you gave me the names of satisfactory parties and I traded with them I would protect you. You did not give you (me) the name of Mr. Westbrook, he applying himself and I replying direct to him. I did not even know that you knew him, and you came here not at my solicitation but representing Mr. Westbrook, as I understood it, to obtain for him the written option which I gave. I therefore can not see that I am under any obligation to pay you 5 per cent.

"Wishing you the compliments of the season, I remain,

"Yours truly,                                      John N. Scatcherd."

Scatcherd testified that the first knowledge he had of Westbrook was Westbrook's wire of September 26th, heretofore set out, and that he did not know that Love had had anything to do with his offer. Scatcherd says that when Love handed him Westbrook's proposed option he said to Love, "this price is net cash to me" and interlined "net" before "cash." That he, Love, made no reply when he said this.

He was asked by his counsel:

"Q. Did you understand that he was coming there (meaning Buffalo) representing Westbrook?"                   ·

"A. That was my understanding of it."                   .

Plaintiff then objected, saying:

"We object to his understanding. Ask him what transpired between the parties and we will have no objection."

.  The court then said:

"He stated awhile ago what occurred."

Scatcherd did not deny the statement of Love that he gave Scatcherd, Westbrook's letter of October 7th, heretofore set out, or that he read it.

Cooper & Fitzhugh, for plaintiff in error.
W. A. Percy, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

Each party requested the court to instruct the jury to return a verdict in his favor. Nor were there any requests for an alternative charge as in Minahan v. Grand Trunk Western Ry. Co., 138 Fed. 37, a recent case decided by this court.

This was tantamount to an affirmance by each party that there was no substantial conflict in the evidence and the facts raised only a question of law. Beutell v. Magone, 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654; Phenix Ins. Co. v. Kerr, 129 Fed. 723, 64 C. C. A. 251, 66 L. R. A. 569; Minahan v. Grand Trunk Western Ry. Co., supra.

The only questions for our consideration are, first, whether there was any substantial evidence upon which a verdict for the defendant might have been rested; and second, whether, upon the settled facts of the case, the court erred in directing a verdict against the plaintiff. Upon a careful consideration of all of the facts in the case we reach

the conclusion that there was no substantial conflict in respect of the facts of the case. The claim of the plaintiff that he was entitled to recover a commission for the sale of the defendant's land depended at last upon the proper interpretation of Love's letter of August 15, 1903, and Scatcherd's reply thereto of August 18th, both of which have been set out in the statement of the case.

That Westbrook was a purchaser procured by the direct solicitation of Love is beyond dispute; that Love induced him to correspond direct with Scatcherd, is not denied and that finally Love went to Buffalo and there brought the minds of buyer and seller together upon an optional sale and purchase is plain.

Counsel for defendant in error frankly admit that the defense to Love's action is accurately stated by Scatcherd in his letter of December 19, 1903, to Love. That letter was in these words:

"Buffalo, N. Y., Dec. 19, 1903.

"Mr. A. M. Love, Jonesboro, Ark.—Dear Sir: Yours of the 14th received. Thank you for your good wishes at this time and I beg leave to state that I do not see wherein I owe you 5 per cent. in my trade with Mr. Westbrook. I wrote you in August that if you gave me the names of satisfactory parties and I traded with them I would protect you. You did not give you (me) the name of Mr. Westbrook, he applying himself and I replying direct to him. I did not even know that you knew him, and you came here not at my solicitation, but representing Mr. Westbrook, as I understood it, to obtain for him the written option which I gave. I therefore can not see that I am under any obligation to pay you 5 per cent. Wishing you the compliments of the season, I remain,

"Yours truly,           John N. Scatcherd."

The plain meaning of the Scatcherd letter of August 18th was that if Love should put him "in communication," with a purchaser and a sale should result that he should have a commission of 5 per cent. At Love's solicitation Westbrook opened a correspondence with Scatcherd and a sale was the direct result. That Scatcherd was not at the beginning aware of the fact that Love had induced Westbrook to negotiate is not of the essence. Before the sale was concluded he became aware of Love's connection with the matter through Westbrook's letter and option handed to him by Love in which Love's instrumentality was plainly stated.

In the light of this letter Scatcherd is charged with notice of the fact that Westbrook was the name of a person furnished by Love. The most that can be made out of Scatcherd's statement that his "understanding" was that Love represented Westbrook is that Scatcherd put a wrong interpretation upon the contract. His "understanding" was not competent and from the ruling of Judge McCall we must understand that it was so regarded and ruled when objected to. Nothing which occurred at Buffalo estops Love from claiming his commissions, even if a waiver or estoppel is competent under a plea of non assumpsit. The uncommunicated understandings of Scatcherd furnish no rule by which the rights of Love are to be controlled. If Scatcherd understood by inserting "net cash" in the option he gave Westbrook, that he was to pay no commission to Love, he should have said so. On its face it meant that his price of $10 per acre meant

"net cash" as between buyer and seller. Love was not the buyer. He did not represent the buyer. He was endeavoring to procure an option which should bring about a sale, but the option was to be given to the buyer by the seller. Ten dollars "net cash" meant that the buyer should pay that net price to the seller. But what about the agent and his commissions? Net cash did not necessarily imply either that Love should have no commissions or that the buyer should pay them. The understanding of Scatcherd may have been one thing and that of Love, another. Neither asked an explanation. Each stood upon his own view of the contract. If Scatcherd in fact believed that Love represented the buyer he would not owe commissions to him and could not have had the matter of commissions in mind, for he did not suppose he would owe any. If upon the other hand he knew or should have known that Westbrook was a customer put in communication with him by Love, he knew he was under contract "to protect him" on a commission of 5 per cent., as stated in his letter of August 18th.

It was upon this contract that Love stood. If Scatcherd expected to escape commissions to Love by interlining "net cash" in his option to the latter, he should have been explicit in so stating. If Scatcherd had been giving a minimum "net cash" price to Love to govern him as an agent in making any future sale, Love might well have understood that the price must net him the sum named free of commissions. Love might have then protected himself by loading his commissions upon the net cash price. But Scatcherd had by wire fixed $10 net cash per acre when communicating direct with Westbrook, and before he says he knew that Love had put Westbrook in communication.

We think the court erred in instructing a verdict for the defendant. Remand, and direct a new trial.