HOYSRADT et al. v. DELAWARE, L. & W. R. CO. et al.

(Circuit Court, M. D. Pennsylvania. February 11, 1907.)

**1. MINES AND MINERALS—DEED TO COAL IN PLACE—CONSTRUCTION.**

In construing an ancient deed conveying coal in place, where the question in controversy is whether the grant included all of the coal under the lot of land described therein, the fact that the person who drew the deed, as appears therefrom, understood the use of technical, apt, and fitting words in which to express and define the terms of the grant in other respects, is an element to be given due weight by the court, and contemporaneous deeds to coal in the same vicinity may also be considered to show the language and terms then commonly employed for conveying coal veins underlying an entire tract of land, and the meaning of other terms used in the deed in question.

**2. SAME—EXTENT OF GRANT.**

In an action in ejectment to recover an interest in a vein of coal, plaintiffs showed a complete chain of title. Defendant claimed through a deed made in 1823 by Feltz, the then owner of the land and the common source of title, to one Wilson, conveying "all that certain coal bed on the Lackawanna creek on lot No. 1 in the township of Providence aforesaid now occupied by the said Wilson, together with a road and cartway to and from the said coal bed to the public road through said lot of land, No. 1, with egress and regress to and from the said coal bed along the said road to the said public road free from and clear from him, the said Albert Feltz, his heirs and assigns, forever." Lot 1 therein described consisted of 334 acres, and extended back from a frontage on Lackawanna creek for two miles, being crossed by another creek beyond which lay the part of the vein in controversy. *Held,* that in view of the fact that in other contemporaneous deeds to coal in the same vicinity, where it was intended to convey the coal under a tract of land, apt words were used to express such intention, as "all the coal lying and being situate in and upon" the premises described, etc., and of the construction placed by the Supreme Court of Pennsylvania upon the words "coal bed" as used in such contemporaneous conveyances, as meaning not the vein, but a quarry or working on the face of a vein from which coal was at that time taken by the process of "stripping," taken together with evidence showing that there was such a quarry on said lot on Lackawanna creek from which coal was so taken by the grantee, Wilson, for some years after the conveyance, such deed could not be construed to include the vein of coal throughout the entire tract of 334 acres, and that, no definite limit to the grant having been shown by defendant, it did not constitute a defense.

At Law. On question of law reserved.

James H. Torrey and H. A. Fuller, for plaintiffs.

Everett Warren, E. N. Willard, and A. H. McClintock, for defendant Delaware, Lackawanna & Western R. Co.

Edward Merrifield and John F. Scragg, for defendant Isaac B. Feltz.

BUFFINGTON, Circuit Judge. This is an action of ejectment, brought July 28, 1902, by Caroline L. Hoysradt and others, citizens of the state of New York, against the Delaware, Lackawanna & Western Railroad Company and Isaac B. Feltz, citizens of the state of Pennsylvania. The suit is for the undivided one-half of a vein of coal known as the "G." or "Big" vein, underlying 100 acres of

land in Providence township, Lackawanna county, Pa. The coal in controversy is worth largely in excess of the statutory jurisdictional sum. Service of the writ was accepted by the railroad company's counsel, and that company defended the action. Much testimony was taken by both parties, but at the conclusion of the trial, both having asked for binding instructions, and there thus (Standard v. Butler [C. C. A.] 146 Fed. 362; Love v. Scatcherd [C. C. A.] 146 Fed. 7) being no question of fact for the jury, the court directed a verdict in favor of the plaintiffs, "subject to the question of law reserved whether upon the whole case the verdict should not be for the defendant the Delaware, Lackawanna & Western Railroad Company, and whether there is any evidence in the case which would entitle the plaintiff to recover."

As the pleadings stood the case assumed a threefold character: The common source of title was Albert Feltz, who received a patent from the commonwealth for the land in dispute March 20, 1819. The plaintiffs claimed title from Albert Feltz by his general deed to Henry S. Hoysradt, dated November 11, 1833; from Henry S. Hoysradt by general deed to Christopher Feltz, dated September 22, 1840; from Christopher Feltz to Isaac B. Feltz, one of the defendants, by general deed dated January 25, 1851; from Isaac B. Feltz to Jacob W. Hoysradt, by deed dated June 9, 1881, restricted to an undivided one-half of G. or Big vein of coal, being the coal described in the præcipe; from Jacob W. Hoysradt, who died in 1890, by will. They also claimed title by adverse possession maintained by Jacob W. Hoysradt and his predecessors more than 21 years prior to the bringing of this suit. The defendant Delaware, Lackawanna & Western Railroad Company claimed title to the G. or Big vein under deed from Albert Feltz to John Wilson, dated November 20, 1823, and subsequent mesne conveyances. It also claimed title by adverse possession by itself and predecessors for more than 21 years before suit brought. The defendant Isaac B. Feltz claimed title to the undivided one-half interest for which suit was brought, by the same conveyances described in the plaintiff's claim down to and including the deed of Christopher Feltz to Isaac B. Feltz, dated January 5, 1851. He claimed he had never parted with that interest; the deed of himself to Jacob W. Hoysradt, dated June 9, 1881, being a mere mortgage, and not a deed of conveyance. He also claimed by adverse possession for more than 21 years. The defendant Isaac B. Feltz offering no evidence in support of his contention that his deed to Hoysradt was simply a mortgage, the issue narrowed down to the titles set up by the plaintiffs, on one side, and by the defendant the Delaware, Lackawanna & Western Railroad Company, on the other. Accordingly, we hereafter designate in this opinion that company as the defendant.

It is proper to here note the coal in the vein in controversy has been for some time mined by the railroad company defendant under an agreement between the parties on a withheld royalty. The agreement, which is not set up in the abstract of any party, or given in evidence, in no way affects the title rights of the parties. It was a mere modus vivendi, pending the judicial determination of the ti-

tle to the coal. The railroad does not attorn to the plaintiffs as its landlord. It stands on a hostile title. It is simply alluded to here to explain the situation.

Now, the facts in the case are as follows: Lot No. 1, in the township of Providence, was one of the certified lots in the 17 townships of Luzerne (now Lackawanna) county, allotted to Connecticut claimants and actual settlers after the Treaty of Trenton, which adjusted the rights of Connecticut and Pennsylvania claimants. It was substantially a rectangular tract, fronting on Lackawanna creek some 80 perches, and extending back some 2 miles to near the base of the mountain. It contained some 334 acres. About two-thirds of a mile from Lackawanna creek, Keyser creek crosses the tract, to the west of which, and extending across the whole width of the lot, is the 100 acres under which lies the coal in controversy. The surface of this 100 acres is held by Isaac B. Feltz, who has lived thereon since 1844.

The plaintiffs, by virtue of the deeds recited in their abstract, have shown a complete title to the coal, and, unless the defendant can show a better—and the burden to do so is on the defendant—are entitled to recover. Henry v. Huff, 143 Pa. 560, 22 Atl. 1046. This the defendant seeks to do by virtue of the deed dated November 20, 1823, by Albert Feltz, the common source of title, to John Wilson, under whom defendant claims. This deed was made by Feltz while the title to all of lot No. 1 remained in him, and was recorded before Albert Feltz's conveyance to Henry S. Hoysradt, under whom plaintiffs claim. It is claimed by the defendant Delaware, Lackawanna & Western Railroad Company that this deed conveyed to Wilson the G. or Big vein under the whole of lot No. 1. If this is correct, judgment must be entered for the defendants; otherwise the title which the plaintiff has shown must prevail. The case turns on the effect of the Wilson deed. Both parties, by their request for binding instructions, concede there was no question for the jury, and, as contended in defendant's brief:

"Upon this deed the defendant's case rests. Its construction is clearly for the court. Did it convey to John Wilson the property described in the plaintiffs' writ? If so, then the verdict must be entered for the defendant."

The deed in question conveys:

"All that certain coal bed on the Lackawanna creek on Lot No. 1 in the township of Providence aforesaid now occupied by the said Wilson, together with a road and cartway to and from the said coal bed to the public road through said lot of land, No. 1, with egress and regress to and from the said coal bed along the said road to the said public road free from and clear from him, the said Albert Feltz, his heirs and assigns forever."

When the terms used in a deed are clear, when the writing is self-explanatory, a court must construe it without resort to extrinsic facts and circumstances; but, with full recognition of that principle, it is equally clear to us that for this court to attempt to construe this deed without due weight and regard given to conditions and circumstances which existed in 1823, and in the light of which the language of this deed was then used and must now be applied, is to run the risk of a court-made deed of 1906, rather than one made by the parties three

quarters of a century ago, determining the rights of Feltz and Wilson in 1823. We do not lessen the force of our decision by frankly conceding that the construction of this deed is a question on which men may well differ. Against any conclusion reached it is possible to raise strong objections. The test, it seems to us, is, not whether we can place a construction upon the deed which we can dogmatically say is unquestionable and unassailable, but rather whether, in view of the uncertainty arising from the language used, would a conclusion different from the one we now reach be itself more certain, more sure—would it more clearly and justly decree what Feltz and Wilson intended and legally expressed in their deed in 1823? The deed was made under conditions which, in the light of the present development of the anthracite coal industry, we can now only partially know, and not fully appreciate; but the conditions and circumstances under which a deed is made may be vital to ascertain its true meaning. As said by Lord Brougham, in Drummond v. Attorney General, 2 H. of L. 837:

"The evidence was admissible in this case for the purpose of showing the circumstances in which the party was when making the instrument. You admit it as you admit evidence in construing a will, not to modify the expressions of the will, not to affix a sense upon the will it does not bear, not to tell you what the meaning of the will is, but to tell you what were the circumstances in which the testator was when he used these expressions, for the purpose of enabling you to ascertain what meaning he affixed to the expressions that he used, and for no other purpose."

But the circumstances in which the parties were will be considered, not only to cast light on their intent, but they also serve to explain the words used, or, as Elphinstone on the Interpretation of Deeds (56) well says:

"To ascertain the meaning of the words used in the writing, every part of it must be considered with the help of those surrounding circumstances which are admissible in evidence to explain the words and put the court as nearly as possible in the situation of writer of the instrument."

To the same effect is Merriam v. United States, 107 U. S. 441, 2 Sup. Ct. 540, 27 L. Ed. 531, where it is laid down:

"It is a fundamental rule that in the construction of contracts the courts may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made."

And Nash v. Towne, 5 Wall. (U. S.) 689, 18 L. Ed. 527, where it is said:

"Courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described."

The defendant has recognized the court's inability to construe the deed from its corners. Its abstract sets forth that on the trial it will, in addition to the Wilson deed, prove "that the coal bed granted to them, under which they claim, as recited in the deed from Albert Feltz to John Wilson, was the Big or G. vein, extending over the en-

tire lot No. 1." In pursuance thereof, it has adduced testimony covering some hundreds of pages of the record, as have also the plaintiffs. In addition to the oral testimony, counsel on both sides exhibited contemporaneous deeds, publications, geologics, reports, etc., as aids to interpretation.

Now, clearly this deed was drawn by a skilled hand. It is the work of one who understood the use of technical, apt, and fitting words of conveyance, warranty, and definition. The terms of conveyance are full and comprehensive. The grant of the road, with right of "egress and regress," shows technical knowledge, and the clause of special warranty, restricting and limiting not only the coal bed, but the right of way itself, to persons claiming under Albert Feltz, is the careful work of one who knew precisely what he wanted to do, and exactly how to do it. The fact of the knowledge and professional skill of the draftsman of this deed is an element to be given due weight in ascertaining its meaning. Were this a paper awkwardly expressed by an ignorant draftsman, no such special significance could be attributed to the presence or omission of particular words and provisions as would be the case in a paper drawn with professional skill. Indeed the conveyance made to Dr. Wilson is in suggestive contrast to many of the inartistic conveyances of coal and coal rights at that period in Luzerne county. We start, therefore, with the thought that, if the parties to this deed meant to convey to Dr. Wilson the coal vein in and under the whole tract of 334 acres, the scrivener, whether it was Dr. Wilson, or Mr. Feltz, or a third person, knew the apt words to use. And the fact that such a scrivener used no words to convey, nominatim, the coal underneath the entire tract by the use of the word "in" the tract, or "underneath" the tract, or any words expressive of lateral extension, is most strongly suggestive that no such intent existed. And the weight and significance of this omission increases when contemporaneous deeds in that region show that the language and terms for conveying coal veins underlying an entire tract, and the value of such veins in their lateral entirety, were then known and acted upon in that vicinity. For example, in 1814, in the deed of Stivers to Cahoon and Bulford, there was a conveyance for $400 of "one equal undivided two-thirds part *of all coal lying* and being situate *in and upon* lots numbered three and four in the third tier of the first division in the township of Newport," etc. It would therefore seem that, when there was an intent to convey the coal veins underlying an entire tract, language commensurate with such extended grant was used. In 1815, in the deed of Bulford to Augur, Bulford, for $200, conveyed one-sixth of the coal under 104 acres, in these words:

"One equal undivided sixth part of all the coal *lying, being and situate in and upon lots* numbered three and four in the third tier of the first division in the township of Newport and county of Luzerne, together with the right of ingress, egress and regress and also to dig, raise and carry away the same with carts, wagons, sleighs or the like."

And in 1816, in the deed of Cary to Stanley, Cary, for $132, conveyed:

"*One third part of all the stone coal* on the following described tract or lot of land situate in Hanover township aforesaid, being part of lot No. 13 in the

third division of lands in Hanover aforesaid, beginning at the south corner of lot No. 13, running thence north sixty-nine degrees and a quarter west along the line of said lot No. 13, forty-four perches to a corner, thence north twenty-one degrees west thirty-six and one-third perches to a corner, thence south sixty-nine and a quarter degrees east forty-four perches to a corner, thence south twenty-two degrees east thirty-six and one-third perches to the place of beginning, containing ten acres be the same more or less, * * * to have and to hold * * * one-third of the coal *in the above premises,*" etc.

Now, in the light of conveyances thus made in Luzerne county conveying by broad words the right to all the coal underlying all of specified tracts, the absence of such like broad expression as "all the stone coal on the following described tract," and "all the coal in and upon lots," etc., are suggestive, and from the use of the term "coal-bed," accompanied by the descriptive words "on the Lackawanna creek," "on lot No. 1 in the township of Providence," "now occupied by the said Wilson," it would seem likely that something different was meant. Now, it goes without saying that the word "bed" is found in geologies of later date, and is defined in dictionaries, as synonymous with "vein" or "stratum." But, while those facts are to be given due weight in construing this deed, the question before us is: What meaning had the term "coal bed" to Albert Feltz and Dr. John Wilson when they made this deed in 1823? It is its meaning to them that must prevail. What, then, was meant in 1823 by this term "coal bed"? The deed itself affords some information as to its meaning to them, and each word giving that information is to be carefully considered and given due effect. None of them can be ignored. In the first place, the coal bed is described as being on Lackawanna creek. The words are, "all that certain coal bed on the Lackawanna creek." In the second place, the coal bed is "on lot No. 1." The words are, "all that certain coal bed on the Lackawanna creek on lot No. 1." Thirdly, the coal bed is "now occupied by the said Wilson." And, lastly, there is a road leading from the coal bed to a certain public road. The words are, "to and from the said coal bed along the said road to the said public road."

Judge Conyngham, in Gloninger v. Franklin Coal Co., 55 Pa. 9, 93 Am. Dec. 720, has, to our mind, clearly shown what a coal bed in those early days was, how it was used, and how and in what way it was made. All parties agree that Judge Conyngham's practice and judicial work made him pre-eminently familiar with the development of the anthracite industry. Speaking of 1808 in that case, Judge Conyngham says:

"There were at that time no large coal mines in operation; small quantities of coal as were needed by the neighboring blacksmiths, were *quarried out* by the blacksmith and his man *at some coal bed, as they were then called.*"

From this case it appears that Judge Conyngham regarded the coal bed, not as the whole vein or bed of coal, but as a working or quarry made in the vein. Thus, he says:

"There is no language here showing that the grantor intended to part with all the coal upon the tract, or even with all the coal in one vein, *in which the bed was originally made.*"

It is clear that Judge Conyngham recognized the term "coal bed" as synonymous with quarry; that a coal bed was not the vein itself, or inclusive of it, but was a working made on the front or face of the vein at a particular place and in a well-known manner. Indeed, in several places he refers to it as an "old coal bed." The Supreme Court evidently adopted this definition, for Judge Reed says:

"It is simply a privilege to dig coal *at a specified coal bed.*"

We have not overlooked the charge of Judge Conyngham in the case of Tams v. Pennsylvania Coal Company, tried in the common pleas of Luzerne county. It is said he there gave the phrase, "two certain quarries or beds of stone coal," the meaning of veins. But it will be observed that both parties to that suit were interested in and conceded that such was the case. This meaning was one put by the counsel, and not by the judge. Thus, he says in his charge:

"What, then, in this case was the subject-matter of the grant or conveyance? Two certain quarries or beds of stone coal. We are saved the necessity of *defining particularly,* or *submitting to you to ascertain,* what may be meant by these expressions, as from the points preferred on both sides, the argument of counsel as to facts read before you, and the general current of claim, defense and argument, it appears that the right, under the terms of the deed, gives authority to follow the two veins of coal, one of five and the other of seven feet, designated as the old coal openings, as proved by Mr. Law and Mr. Bowkley, into and over the lot No. 9 in Pittston, a greater or less extent, as the different parties construe the deed. The right to follow these veins, at least the length of the Blackman line and the width of seventy rods, is not denied by the defendant. To follow them further and more extensively is claimed by the plaintiff. We thus understand and *draw our conclusions, from the conceded views of the parties,* that the conveyance of the two quarries or beds of coal would give the purchaser the right to pursue these veins upon lot No. 9; that is to say, as far as the grantor could convey, and to any extent within the bounds of the lot, unless by the conveyance showing the manifest intent of the parties the extent was restricted and limited."

A study of this case shows that Judge Conyngham carefully and persistently based his conclusions on the concession thus made. If all parties to the present suit were claiming under the Wilson deed, and conceded what was conceded in the Tams Case, we too would not hesitate to take the conceded construction of the parties as that to be followed by the court.

Now, the description of a coal bed as a quarry makes applicable and effective each and every descriptive word used in the deed before us. For example, there is no such significance to be attached to the word "all," in the phrase "all that certain coal bed," as to make it necessarily apply to and cover all the vein under all the 334 acres of lot No. 1. It serves to convey all the coal bed as distinguished from part of it, for example, an undivided half part, which as may be seen in the conveyance of Price to Fell in 1824, where the conveyance was of "one equal half part of the coal bed now opened on the south part of the northerly half part of lot No. 65," etc. So, also, the words, "on the Lackawanna creek." Unquestionably the quarry or stripping which Dr. Wilson was then occupying and working was "on the Lackawanna creek." It fronted for many rods on that stream. The coal bed was "on lot No. 1," not "in," and the use of the word "on," and not "in," is the more significant from the use of the word "in" just

following, where lot No. 1 is described as "in the township of Luzerne aforesaid." Regarded as a quarry, a coal bed would be fittingly described as located "on" land; as a vein, it would not be fittingly described as "on" land. And we shall see later that, understanding by the term "coal bed" a quarry, we are able from the evidence and by cotemporaneous deeds to give effect to the descriptive words, "now occupied by the said Wilson," when applied to coal bed in the sense of quarry.

Zachariah Cist was another prominent and weighty authority in early anthracite development. In a letter written from Wilkes-Barre in 1821, and published in Silliman's American Journal of Science, vol. 4 (1822), he shows that the quarrying out process of the blacksmith of 1808, as described by Judge Conyngham, was still followed as coal came into wider use. He writes:

"One or two of the beds are worked by leaving massive pillars 8 or 10 feet square at the base, but with the exception of these the beds, which are very numerous, are worked au jour; that is, the superincumbent strata are first removed, when the coal is either blown off with gunpowder or taken off with wedges by drilling in a straight line, at suitable distances of from 12 to 24 inches apart, several deep holes about 2 inches in diameter, dropping in each two long semicircular wedges, the thick end of each down, and driving in a long very gradually tapering wedge between them, so that the greatest pressure shall be at the bottom. These wedges are alternately driven, until a large mass of the coal breaks off, when it is broken up with sledges, of a convenient size for handling. Gunpowder is occasionally used, but the effect is much less certain than that of the drill and wedges."

And this stripping method Wilson followed. Thus, defendant's witness Knapp testified his father, by permission of Wilson, worked the bed for 10 years following 1844–1846. He says:

"We only worked wintertimes. About 10 years—somewhere near—that we had it in possession; that is, my father had. He occupied it for about 10 years. * * * Dr. Wilson used to come to our place and stop and talk to father about it, and I think, as near as I can remember now, before we ever burned any coal. And he told him, if he would go in there and cut what coal he wanted to use for himself, he would give him all he wanted to use for himself—enough to buy powder and light—and see he didn't have any expense at all. And we cut the coal. * * * The reason we stopped I don't know whether the Doctor sold it or not, but there came a high flood, and it rushed in there, and that rock, I think eight or ten feet, and the dirt, came down, and shut it out of sight altogether, and we thought it wasn't worth opening again."

Referring to Knapp's operations, defendant's witness Atherton says:

"In the winter they used to mine the coal, because they were farmers, and mined only for their own conveniences, and didn't mine much in summer."

To the same effect was the testimony of defendant's witness Dodge, a mining engineer who came to the region in 1874, and, in answer to the question, "How were these beds, so far as the evidence then existed, and within your knowledge or observation—how were they originally opened, or taken possession of?" said:

"They were opened by farmers that drove there with their teams and got coal. They did not follow it in far. They were what we call strippings— really what the Wilson opening is."

This corresponds with the evidence of what was found at a much later day. Thus, defendant's witness Stevenson, in answer to the

question, "What, if any, indications were there on the surface of the
ground near the bank of the river at and immediately in from, of, or
along the side of this opening in the Wilson drift, or indeed in its
interior, to indicate the way the coal had been removed from the vein
there?" says:

"Well, it is so covered with the débris that has dropped apparently from
above, the sliding of the bank, that it is a little difficult to determine; but it
would indicate to me that the coal had been worked out for a distance varying
from 25 to 40 feet from the crop on the river without leaving any support to
the overhanging rock, which has since fallen, in a very crude manner, and
since the working the whole top had caved in, leaving only this one little
place accessible."

Now, in view of this general practice of stripping; that the Wilson
coal bed was thus stripped some 200 or 300 feet along the bluff of the
creek; that this exposed, as stated on the trial, many thousand tons
of coal; that Cist in his letter above quoted says, "The coal is here
valued at 50c. per ton, in the mine"—it would seem most likely that
the very substantial, valuable, and extensive grant of the coal bed
"on the Lackawanna creek" and "now occupied by the said Wilson"
was what the parties had in view, and not a vein of coal underlying
334 acres not occupied by Wilson, not then known indeed to under-
lie the tract, so far as any evidence before us shows.    Indeed, that the
coal in sight and reached by the method of stripping then in vogue was
regarded as practically inexhaustible is shown by the fact that Dr.
Wilson secured a road in perpetuity "to and from the said coal bed
to the public road," and at the end of 80 years the coal in sight in the
stripping has not been exhausted.

Much stress is laid on the fact that the consideration in this deed
was $300, and it is contended that, because Albert Feltz paid some
$1,500 for the whole 334 acres, $300 was a good and likely price for
his coal.    But this contention, though at first sight of weight, on
consideration, bears decidedly the other way.    The land price exacted
by the state is always low, and we must remember that Feltz's title,
and therefore his purchase money, was based on a certificate dated
1804.    Values in 1823 cannot safely be compared with those of 1804.
Three hundred dollars for this vein would be less than a dollar per acre.
Conveyances of much earlier date than the one here in question show
that, even then, coal was selling at a very much higher price per acre.
Thus, in 1810, Cussie received from Hepburn $600 for the coal in lot
No. 49 in the first tier of the fourth division, 121 acres.    As far back
as 1810, Steel received $330 from Bulford for the coal under lot 29
in Hanover township, being 324 acres.    In 1814, Stivers conveyed to
Bulford two-thirds of the coal in lots Nos. 3 and 4, third tier, first
division, 104 acres, for $400.    In view of these earlier prices, and of
Cist's statement in 1821 that coal was then worth 50 cents per ton
in the mine, it would seem very unlikely that a sale of a lateral vein
extending under 334 acres was in 1823 made for $300.

The words, "now occupied by the said Wilson," descriptive of this
coal bed, must receive due weight.    These words do not apply to the
surface of lot No. 1, and they do not necessarily apply to a vein under
the whole of it.    Such a construction is not required, to confer on

Wilson ownership of what he was then occupying. "In the primary and most familiar sense of the word 'occupy,' " says the Supreme Court of Pennsylvania, in construing that word in Lacy v. Green, 84 Pa. 520, "it is the equivalent of the word 'possess.' It implies the conception of permanent tenure for a period of greater or less duration." If this be the correct meaning of the word "occupied," then the term would neither be used in connection with a vein, nor would it be applicable in any way to Wilson's tenure, since prior to the deed there is no evidence that he claimed, or indeed had anything to do with, the vein in its broad lateral extent, or that the term "now occupied by the said Wilson" is referable to any other possession than holding or working a coal bed or quarry. A man may well be said to occupy a coal bed, if it means a quarry. It is hard to see how he could occupy a coal bed, if it means a vein. And we must remember these words were used in a writing made by a competent scrivener. But light is thrown on this word "occupy," as well as that of "coal bed," by their use in one of the deeds to which reference is made above. Thus, in the deed of Cary to Stanley, in which, as we have seen, there was a conveyance by apt words of "one-third part of all the stone coal in the following described tract," etc., there was also an agreement in reference to a coal bed or quarry on another small lot. The word "occupy" is there used as synonymous with "work" or "operate." The deed states:

"It is also further agreed and understood by the said parties Cary should clear off the coal bed on the above-mentioned premises in the absence of the said Stanley, what coal he shall take away during the absence of the said Stanley he shall not be accountable for, but if the said Stanley should want to occupy the said coal bed before the said Cary has taken off his coal, the said Stanley is to pay the said Cary for one-third of the labor expended in clearing off the coal bed aforesaid."

From this it will be seen, in the first place, that the term "coal bed" was here used as synonymous with "quarry" or "stripping." It was a place. It was something that could be cleared off. "Cary should clear off the coal bed on the above-mentioned premises." And, secondly, that the term "occupy the said coal bed" was not understood as a holding or possession of a vein of coal lying removed and under cover, but was an external surface possession which would interfere with coal already dug, and which Cary was evidently to carry away before Stanley could "occupy" the coal bed. In other words, Cary must carry away his quarried coal before Stanley could occupy the coal bed; that is, could quarry more down. Thus, in this conveyance in that region and of substantially the same date, the words "clear off" and "occupy" are used and are explainable when by the term "coal bed" is meant a quarry. They cannot be applied to it, if it means a vein. You cannot "clear off" a vein. You do not "occupy" a vein. And such local use of these words is of vital importance, when we are seeking the meaning of a deed made by local men in reference to a distinctively local subject. "As words and phrases of speech are to be expounded and construed as they are generally understood, so it is likewise in particular places," says Barksdale v. Morgan, 4 Mod. 185. "And therefore, if I covenant to convey to another an acre

of land in Cornwall, the common acceptation of the word 'acre' there amounts to as much as a hundred of other counties. So a 'perch' in Staffordshire is as much as twenty perches in some other place. Therefore such words must be governed by the common and known acceptation of the people."

It goes without saying that the words, "bed," and "bed of coal," have been and are at times used as synonymous with "vein," for geologies, dictionaries, and current speech recognize such use. But, in face of the practice of quarrying in common use in Luzerne county, in face of the fact that such a coal quarry was what Wilson had occupied and worked, and that such a quarry was what he afterwards occupied, it would seem clear that, when these men put, or the scrivener put, the word "coal bed" in the deed and described it as "on the Lackawanna creek," and as "now occupied by said Wilson," that term meant a quarry. This is illustrated by the deed of Thomas Fell to George Price and wife of January 15, 1824. By it Fell conveyed in fee simple 54 acres, "the northerly half part of lot No. 55 in the first division of said Pittston," for $375. On the same day Price and wife, for the consideration of $1, conveyed to Fell "one equal half part of the coal bed now opened on the south part of the northerly half part of lot No. ———, * * * together with a sufficient road and cartway to and from said coal bed, with liberty to work one equal half part of said coal bed at all times without interruption." The conveyance of the whole tract by Fell for a substantial consideration, and the reconveyance for a nominal consideration of the half of the coal bed, shows that that term "coal bed" was used as a "quarry," and not as a "vein." Now, this restricted character of a "quarry," which we regard as synonymous with "coal bed," is referred to in Shaw v. Wallace, 25 N. J. Law, 462, where it is said:

"Now, a 'mine,' properly speaking, is the pit or excavation in the earth from which the ore is taken. The term is certainly used to include the bed or vein of ore into which the pit enters, so far as may be necessary to the working of the mine; and the whole series of shafts and subterranean passages and the chambers connected with it. But neither in ordinary parlance, nor in strict technical language, is a 'mine' understood to indicate the entire ore bed with which the shaft may be connected. And by a 'quarry' we understand, not an indefinite extent of stone or rock which may be worked, but the spot where the rock is quarried. The 'ore' may extend indefinitely, but the 'mine' is the pit from whence it is extracted."

It is proper to here note that the deeds from which extracts are made have not been the only ones selected because they supported any particular view, but the others have not been referred to because they did not throw any light on the case. For example, the deed from Cussie to Hepburn, of 1810, is the original title on which many of the other conveyances are based, and these must be considered in connection with the parent deed. Now, it is true the parent deed conveys "a certain coal bed or beds," and in such subsequent deeds it seems that this term is sometimes treated as synonymous with veins; but it will be noted that there are also used in the original deed other words and terms which greatly enlarge that term. Thus, it conveys "a certain coal bed or beds in or upon lot No. 49, * * * now in the possession of the said William Cussie, Jr., and all other beds or potts

of coal in or upon said lot of land," and it further covenants that the grantee "shall have full right and lawful authority to enter upon said lot of land or any part thereof, and dig, raise, cart and carry away the coal in or upon said land, without let or molestation from him, the said William Cussie, his heirs or assigns, or from any other person or persons hereafter forever."

From all these considerations, it seems to us that the parties to this deed had in view this quarry or stripping which Dr. Wilson had theretofore been occupying by operating, and that it was this quarry which was meant to be conveyed, for, to use the language of Judge Conyngham in the Gloninger Case, supra:

"It is difficult to conceive that these parties really supposed that the one was selling and the other buying the exclusive right to take all the coal upon the tract, or even in the one great vein."

Is it credible that, when these parties made this deed, they understood that, if Feltz, the grantor, found an outcrop of the vein back in the Keyser Creek Valley, or at any other place on his 334 acres, the conveyance of the coal bed "on the Lackawanna creek," "now occupied by the said Wilson," would prevent Feltz from starting and occupying a coal bed himself possibly two miles back from that stream?

If we are correct in our conclusion that the intent of the parties, or the effect of the words they used, was not to convey the coal underlying the whole tract, it is then asked what was meant by such a conveyance? How far did Wilson have a right to take coal? What line defines his right? And, because no exact line is fixed by the deed, it is therefore contended he was bound by no line, and the conveyance must be held to cover the entire tract. But that conclusion by no means follows. To require the court to read into this deed boundary lines is to assume the premise that the parties in 1823 meant that the deed was meant to limit by boundaries a certain inclosed area of coal. This, in our judgment, is just what the parties had no thought of doing in 1823. It must be observed that this deed is brought forward by the defendant to defeat an otherwise complete title vested in the plaintiff by sufficient deeds. The existence of this deed of 1823 is not of itself sufficient to defeat the plaintiff's title. Its efficacy in that regard lies in the fact that it must be shown, either by express words or by necessary implication, that it conveys the coal under the hundred acres in controversy, to which otherwise the plaintiff has shown title. Now, if the description in the deed is so indefinite, so incapable of application by lines and boundaries, that it does not certainly include the plaintiff's coal, and was not in 1823 meant to include the coal under the whole tract and cover the land embraced in this suit, it should not avail to defeat the plaintiff's title. It is contended, of course, that there are definitions of boundaries in the reference to tract No. 1; but we regard the phrase "on lot No. 1" as qualifying the term "coal bed on the Lackawanna creek." It united with the term, "on the Lackawanna creek," to locate the coal bed "now occupied by the said Wilson," as being on a certain stream and tract. It seems to us these qualifying terms, "on the Lackawanna creek," and "on lot No. 1 in Providence township," are descriptive terms to locate the coal bed, and not to define the limits or extent of the vein in which that coal bed was made.

Apart from so defining and describing the location of the coal bed, it seems to us these qualifying words have no other effect, and that the deed would have the same effect if it read, "all that certain coal bed on the Lackawanna creek, in Providence township, now occupied by John Wilson," for oral testimony would show that such coal bed then occupied by Wilson was located on the Lackawanna creek and on lot No. 1.

But, returning to the question referred to, we remark that one of the requisites to a deed is certainty of its subject-matter. 2 Blackstone, 298. Now, if the parties have omitted to define what was meant, and to define it by boundaries and limits, to that extent it lacks the certainty requisite to a conveyance. From the surrounding circumstances and conditions when this deed was made, there is nothing to require a construction that this grant covered 334 acres of coal laterally in order that John Wilson should have full enjoyment of this grant. Nor is the court called upon to say just what the deed did convey to John Wilson. That it conveyed to him the coal bed on the Lackawanna creek is certain. How far back from the Lackawanna creek that grant extended it was for the defendant to show. This burden was upon him, and therefore we say, adapting the language of Henry v. Huff, 143 Pa. 561, 22 Atl. 1046, to this case:

"The only real question raised was: Where is the eastern line of the defendants' coal bed? Upon this question the defendant had the burden of proof, and it was its duty to show that such eastern line inclosed the coal claimed by the plaintiffs. Failing to do this, it failed in its defense, and the plaintiffs are entitled to recover."

Before closing, we deem it proper to say that we have not overlooked the defendant's alleged title by adverse possession. The vein in controversy underlying this tract of 100 acres was not taken possession of or mined by the defendant, and there is no evidence of any such open, notorious, continuous, and hostile possession thereof as would create a title of that character. The entries that were made were very limited in character, were not continuous, and knowledge of them was not brought home by any surface indications, or indeed in any way to Isaac B. Feltz, who resided on the surface, or to any person claiming under him. It is further proper to note that, as grounds for a new trial, numerous rulings of the court during this protracted trial are set forth. As the case took shape, both parties conceded there were no questions of fact for a jury to pass upon, and as we have carefully refrained from using, in this opinion, any facts, papers, maps, or evidence objected to by the defendant, concerning which any question is raised on the motion for a new trial, it will be obvious that no harm was done to the defendant by the rulings of the court in that regard, and therefore, as well as on the ground that we find no error in the rulings, the motion for a new trial will be refused.

After careful consideration, we are therefore of opinion that the motion of the defendant to enter judgment in its favor on the reserved point and non obstante veredicto should be denied. The clerk is therefore directed to enter judgment on the verdict in favor of the plaintiff and against the Delaware, Lackawanna & Western Railroad Company and Isaac B. Feltz, the defendants.